## CITYCO REALTY COMPANY *v.* MAYOR, COUNSELOR AND ALDERMEN OF THE CITY OF ANNAPOLIS.

[No. 4, April Term, 1930.]

*Decided May 15th, 1930.*

The cause was argued before BOND, C. J., URNER, OFFUTT,. DIGGES, PARKE, AND SLOAN, JJ.

*John L. G. Lee,* for the appellant.

*George B. Woelfel,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

The City of Annapolis is situated on a peninsula, the shores of which are washed by the waters of College Creek. on the north, by the Severn river and Spa Creek on the east, and by Spa Creek on the south. The terrain is moderately elevated and slopes irregularly from the State House, near the center of the city, to these waters, which are all estuaries or tidal rivers.

Spa Creek runs from its source south of Annapolis in a northeasterly direction about one and one-fourth miles to its. junction with the Severn river, at which point it flows between Eastport and Annapolis.

For many years, certainly since 1913 or 1914, the municipality has maintained outfall sewers through which sewage from that part of the city lying southwest of the Duke of Gloucester Street, which runs from College Creek to Eastport, has been collected and discharged into the waters of Spa Creek. The present population of the city is said to be about twelve or fifteen thousand, and it is estimated that of that total six or seven thousand persons occupy that part of it served by these sewers. A part of the sewage from the United States Naval Academy, which lies immediately northeast of the city proper, as well as some from Eastport, and areas outside the municipal limits, is also discharged into Spa Creek, and the volume gathered from these several sources and discharged into those waters is said to be nearly 1,300,000 gallons per day. The creek itself is from two to five hundred feet or more in width, in places it has a depth of from fourteen to sixteen feet, and the rise and fall of the tide in it is from two and one-half to three feet.

The pollution of its waters as a result of these conditions has long been recognized as a possible menace to the public health, and in 1912 or 1913 the Maryland State Department of Health made a complete survey of the situation for the purpose of formulating some system of disposal, by which all the sewage of the city could be gathered, conducted through a disposal plant, and so far purified and disinfected that the effluent could be discharged into adjacent waters without offence to the senses or danger to the public health.

Following that survey, the Legislature, by Chapter 818 of the Acts of 1914, authorized the Mayor, Counselor and Aldermen of the City of Annapolis to construct a sewerage disposal plant, and to borrow on the faith and credit of the city $50,000 to defray the cost of its construction, provided the Mayor, Counselor and Aldermen of the City of Annapolis enacted an ordinance approving the loan, and such ordinance was ratified by a majority of the voters, voting at an election to be called for the purpose of passing on that question.

Nothing appears to have been done under that act, and in 1920 another statute, Chapter 180 of the Acts of 1920, was

passed. That act, after reciting in its preamble that: "Whereas, The State of Maryland, the City of Annapolis and the United States Naval Academy and other government property at Annapolis under the provisions of Chapter 777 of the Acts of 1914 of the General Assembly of Maryland contemplated taking steps to rid the waters of the Severn River and creeks adjacent to Annapolis of the filth and pest of the sewage entering into the same," provided for the appointment of a commission to perfect plans for the disposal of such sewage. A commission was appointed in accordance with the act, and it reported its finding and conclusions to the Legislature in 1922, but no action in connection with its report was taken. Chapter 777 of the Acts of 1914, referred to in the preamble of chapter 180, *supra,* recites that:

"Whereas, The United States Department of Agriculture, through its Bureau of Chemistry, and acting in connection with the Hygienic Laboratory of the Treasury Department, has recently been conducting an investigation of all of the oyster beds of the Chesapeake Bay and its tributaries, as a result of which investigation it has been announced by the said Department of Agriculture that the Severn River is very badly polluted, which pollution is directly attributable to the dumping of sewage from Annapolis and the United States Naval Academy and vicinity into said river; and

"Whereas, The said Department of Agriculture has ruled as a result of this investigation that all oysters taken from Severn River should be transplanted in non-polluted waters before offering for shipment, so as to escape liability under the Pure Food and Drugs Act, June 30, 1908; and

"Whereas, The said pollution is a direct and serious menace to the health of the inhabitants of Annapolis and vicinity, as well as being objectionable on account of the interstate shipment of oysters from this locality; and

"Whereas, The State of Maryland, through its large property holdings in the City of Annapolis, largely

152

contributes to the objectionable conditions aforesaid through its use of the sewers of said city; and

"Whereas, The United States Government, through its institution at the Naval Academy, also largely contributes to the cause of said pollution of said Severn River, and also the said City of Annapolis, and have inaugurated a movement to remedy said conditions by construction of a sewerage disposal plant."

From 1922 to 1926 the question of sewage disposal in the City of Annapolis remained in abeyance for the ascribed reason that during that period the city was engaged in installing at a cost of some $300,000 a new water system, but in 1927, by an agreement between the Mayor and Counselor of the City of Annapolis and the State Department of Health, legislation looking to the establishment of some adequate and safe system of sewerage disposal in the City of Annapolis was submitted to the Legislature, but no action taken as to it.

The Legislature did however, by chapter 641 of the Acts of 1927, empower any governing body of any city or town in the state to establish and maintain sewerage disposal systems, and to secure funds therefor by issuing bonds in any amount not exceeding five per cent. of the assessed valuation of all property listed and assessed in any city or town proceeding under the act.

Sewerage conditions in the City of Annapolis were in that state when, on April 25th, 1927, the Cityco Realty Company acquired by deed from Samuel Bealmear seventy acres of land lying east of the Ferry Point Road, and binding on the south and west sides of the upper part of Spa Creek, and it later acquired another tract of seventy acres lying east and south of the first tract and adjoining it. The company at once subdivided the first tract, known as "Silopanna," into building lots, many of which fronted on Spa Creek, and improved it by removing trees and undergrowth, establishing roads, grading the land, and erecting several houses. The apparent purpose of the Cityco Realty Company in acquiring the land was to sell it off in building lots, but it contends that,

when it attempted to dispose of its lots, it found that the polluted condition of Spa Creek made them practically unsalable. It therefore, on September 21st, 1928, filed the bill of complaint in this case against the Mayor, Counselor and Aldermen of the City of Annapolis, in which it alleged that the defendant daily discharged into Spa Creek large quantities of sewage, "which condition breeds flies and mosquitoes, and the smell and stenches from said sewage and said sewers, particularly when the wind is blowing from the east, turns the stomach of people who cannot eat their meals in comfort, it impairs their health and makes it impossible to interest the public in the purchase of said lots bought to sell, as aforesaid; and therefore it is impossible to sell or dispose of said property as was contemplated when it was bought by your orator."

It further alleged that formerly the waters of that creek were fit for bathing, unpolluted and potable, but that now since the "defendant's wrongs," they "have become discolored with vegetable and animal matter and with the refuse of kitchens, waste water from bath rooms and sinks, and overflow from cess pools; and the waters of said creek are now covered with an obnoxious green scum and the banks of the same marked with deposits of an obnoxious nature and said Spa Creek gives off a foul and disagreeable odor, especially in periods of dry weather, so that the waters of said Spa Creek are no longer fit or safe to drink, bathe in, swim in or boat upon," and it prayed that the defendant be enjoined from discharging any part of its sewage into "the said Spa Creek."

The defendant in its answer admitted that it discharged sewage into Spa Creek through sewers constructed by it, but alleged that they were established by competent authority, were properly constructed, that they discharged into tide water, and were for the "benefit of sanitation, health and comfort of the population of Annapolis, and adjacent territory." It denied that the waters of Spa Creek ever were potable, and denied that it was responsible for their present polluted condition, but asserted that its present condition was due to

natural causes. Issue was joined on those pleadings, testimony taken, the case heard, and, after the hearing, the chancellor on September 19th, 1929, filed a decree dismissing the bill with costs to the defendants. This appeal is from that decree.

Without attempting to analyze it in detail, it suffices to say that it appears from the testimony that the waters of Spa Creek are heavily polluted, that the count of intestinal bacteria in them is abnormally high, that their condition does constitute a menace to the public health, and that the City of Annapolis contributes largely to that result. These facts are not only established by the testimony, but they are so patent and notorious that the General Assembly of the State has on two occasions solemnly asserted that they exist. It also appears that there has been no physical invasion of the appellant's property by the deposit on it of silt, sludge, or any offensive or noxious matter, that can be traced to the appellee; that the waters of Spa Creek are tidal waters and that the appellant has no proprietary interest in them; and that while they are polluted by the discharge of sewage into them, that the pollution is of such a character that it does not necessarily create noxious or offensive odors, fumes or gases, although it may be inferred that they do at times give off noticeable and offensive odors. One witness, a salesman for the appellant, testified that he had noticed such odors, another, Abel Wolman, chief engineer of the State Department of Health, said that the decomposition of the sewage deposits would at certain seasons of the year produce gases, primarily hydrogen sulphide, which would give off objectionable odors, and that he had actually noticed such odors. On the other hand two witnesses, one the city commissioner and the other the health officer for Annapolis, testified that, although they were familiar with the waters of Spa Creek and had often been on them, they had never noticed any offensive odors or smells. It is, however, consistent with reason and experience that the discharge of over one and one-fourth million gallons of raw sewage per day into the waters of a small land-locked estuary, such as Spa Creek, will not only pollute its

waters, but that it will likely cause offensive odors in warm weather. It also appears that the conditions of which it complains existed long before the appellant bought the land which it is now developing, and there is nothing in the record to indicate that the value of that land is any less at this time than it was when appellant bought it. It may also be inferred that, while the effect of the condition of Spa Creek on the salability of the land in lots for residential purposes may be very severe, yet when appellant bought the land it was in a single tract, and the plan of subdividing it and selling it off in building lots originated with it. In other words, the appellant bought undeveloped rural property binding in part on these polluted waters, and presumably received in the amount of the purchase price the benefit of any diminution in the value of the property due to the alleged nuisance which it seeks in this proceeding to abate. And while there is nothing objectionable in such a course, nevertheless these circumstances have a definite tangible weight and significance, in weighing the relative equities of the parties to this proceeding to determine whether appellant is entitled to the harsh and drastic remedy sought in this case.

Neither the alleged nuisance, nor the conditions which produce it, are of sudden growth, but they have resulted in part from efforts on the part of the municipality extending over a long period of time to remedy even worse conditions, and are in part at least due to acts over which it has no control, such as the discharge of a large volume of sewage from the United States Naval Academy Reservation into the same waters. The plan adopted by the city, of discharging so large a part of its sewage, unfiltered and untreated, into public waters washing the shores of such a densely populated territory, was no doubt crude, ill-considered, and unwise, but nevertheless it has been permitted to exist and to be expanded, until at present it is the only method for disposing of the sewage from a densely populated urban territory occupied by some six or seven thousand persons.

That a court of equity is authorized to restrain a public nuisance, at the suit of one upon whom it inflicts some special

damage or injury differing in kind or degree from that suffered by the general public, has long been a closed question in this state. *Fort v. Groves,* 29 Md. 193; *Hailton v. Whitridge,* 11 Md. 128; *Block v. Baltimore,* 149 Md. 39; *High on Injunctions,* sec. 762. Although the exercise of the power may be affected by such considerations as that the complainant has an adequate remedy at law (*High on Injunctions,* sec. 761; *Wood on Nuisances,* secs. 533, 745, p. 991; 46 *C. J.* 771; *Lohmuller v. Kirk,* 133 Md. 78; *Bonaparte v. Denmead,* 108 Md. 174; *Bartlett v. Moyers,* 88 Md. 715), that special boards are created to remedy the alleged evils (*People v. Equity Gas Light Co.,* 141 N. Y. 232; *High on Injunctions,* sec. 761; *Wood on Nuisances,* sec. 777, p. 1125), or that the loss and injury to the complainant occasioned by the alleged nuisance is slight and inconsequential when compared with the injurious effects which its immediate abatement might have on the public welfare. 20 *R. C. L., "Nuisances,"* sec. 93.

But assuming that a public nuisance which injuriously and specially affects private rights may be enjoined, the concrete questions presented by the appeal are: (1) Whether the acts complained of constitute a nuisance, and (2) whether, if they do, they should be restrained under the circumstances of this case.

The rule, recognized wherever the question has arisen in the courts of this country or England, is that the discharge by a municipality, acting in the exercise of power conferred by the state, of sewage into tidal waters, is not a nuisance.

The leading case in which that question is examined is perhaps *Marcus Sayre Co. v. City of Newark,* 60 N. J. Eq. 361. The essential facts of that case were that the complainants owned and possessed land having a frontage of about two hundred feet on the Passaic River in the city of Newark, at a point where the tide ebbs and flows, and where the river is navigable. The city proposed under proper legislative authority to construct an outfall sewer and through it to discharge a large volume of sewage into the Passaic River below highwater mark, and about fifty-six feet north of complainants' property. The complainants objected that the opera-

tion of the sewer would so infect the waters of the river as to interfere with the reasonable comfort and health of persons engaged on their premises, and would lessen the value of their property. The question in the case was whether the Legislature had the constitutional power to confer upon the municipality the right to use the Passaic River as an outlet for its sewers, regardless of the effect such use would have upon private property washed by the waters of that part of the river where the tide ebbs and flows. In that case Judge Dixon, of the Court of Errors and Appeals, said: "Indeed, the history of sewers shows that from time immemorial the right to connect them with navigable streams has been regarded as part of the *jus publicum.* Although in England, until modern times, sewers were used chiefly to drain lowlands liable to be submerged by tide and rain, and the streets of towns, yet in other countries for centuries past, and more recently in England and the United States, they have been constructed to carry off the sewage of dwellings; and whenever tidal streams could conveniently be reached, they have been employed as the medium of discharge to the sea. Such a use of public waters must necessarily entail some defilement. The degree of pollution to be permitted is a matter over which the Legislature has full power and control. * * * The last point for consideration is whether the complainants may restrain the exercise of this authority because of the incidental damage which it will cause to them and their property. The principle laid down by the Supreme Court in *Beseman v. Pennsylvania Railroad Co.,* 50 N. J. Law, 235, and approved by this court in 52 *N. J. Law,* 221, disposes of this phase of the controversy. That principle is that, if a corporation, though private, in the reasonable exercise of a franchise lawfully granted to it for a public purpose, causes an incidental damage to private property, such damage is *damnum absque injuria.* The principle thus enunciated is applicable *a fortiori* to a public corporation. The same doctrine was declared with reference to tidal streams in *Stevens v. Patterson etc. Railroad Co., supra,* where the chief justice said that, 'as a general rule, the public domain is subject altogether to the con-

trol of the Legislature, and that incidental damage resulting to individuals from the exercise of such control gives no legal claim to compensation.' "

In *Hampton v. Watson*, 119 Va. 95, the Virginia Supreme Court of Appeals carried the doctrine even further. In that case the state had leased to the complainant certain oyster beds. The City of Hampton constructed a sewerage system, the operation of which so polluted the waters of Hampton Creek, where the beds were located, that their value was destroyed. In a suit to enjoin the pollution, the court held that: "The state guards the health of its people for the benefit and protection of the public at large; and, under present sanitary standards, sewerage systems for all thickly settled communities have become an imperative necessity, a public right, which is superior to the leasing by the state of a few acres of oyster land within the corporate limits of a city to an individual at $1 per acre per annum. When the plaintiff leased this land, he took it with full knowledge of the then existing sewerage emptying into Hampton Creek, and subject to the public right to increase the same as necessity required on account of the growth in population of the City of Hampton.

"In conclusion we are of opinion, in the light of the authorities cited, that the defendant city was acting within its lawful right in emptying the sewerage complained of into the waters of Hampton Creek, and that any injury occasioned the private oyster bed of the plaintiff thereby was *damnum absque injuria*."

See also 9 *R. C. L., "Drains and Sewers,"* sec. 76; *Wood on Nuisances*, sec. 430; *Gould v. Hudson River R. R. Co.*, 6 N. Y. 532; *Stevens v. R. R. Co.*, 34 N. J. 532.

In *Haskell v. New Bedford*, 108 Mass. 208, the plaintiff brought an action against the municipality for damages occasioned by the operation of its sewer which discharged into tide water large quantities of filthy and offensive matter which was deposited by the tide on his property and caused offensive and pestilential odors so as to be a public nuisance. In that case, while the right of the defendant to discharge sewage into tidal waters was recognized, it was held that that

right did not include the privilege of committing a nuisance upon private property or that of the commonwealth, and that for the damage resulting from depositing the offensive matter on his property an action lay.

In 84 *A. S. R.* 922, there is a very valuable note, in which the cases dealing with the rights of owners of lands lying along tidal waters are collected and analyzed, and what appears to be the general rule is thus stated by the editor: "The title to a tidal stream below ordinary highwater mark is in the state as absolute owner. A riparian owner has no title to the land under such waters by reason of his adjacency thereto. The state is the absolute owner of the bed of the stream, and may grant rights therein as it sees fit, subject to the right of the public to use the stream for purposes of navigation. For this reason tide waters are subject to a different rule from ordinary streams, and statutory authority to discharge sewage into a tidal stream is a sufficient defense to a suit for an injunction on account of the pollution of the stream, and ordinarily the city is not liable to a charge of maintaining a public nuisance."

The basis for the conclusion reached in cases establishing that rule, that navigable tidal waters and the land beneath them are the property of the State, was recognized in *Day v. Day,* 22 Md. 530, where it is said: "Rivers or streams within the ebb and flow of tide, to high water mark, belong to the public, and in that sense are navigable waters; all the land below high water mark, being as much a part of the *jus publicum,* as the stream itself. The owners of adjacent ground had no exclusive right to such lands, nor could any exclusive right to their use be acquired, otherwise than by an express grant from the State." Adopting the premise set up in that case and reasoning from it, while we are not prepared to go as far as the court went in *Hampton v. Watson, supra,* in our opinion, it does follow that the State may grant to a municipality the right to discharge its sewage into tidal waters, and its acts done in the legitimate exercise of that authority cannot be regarded as a public nuisance. And while there may be limits to the extent to which the municipality can

carry that privilege, as in *Haskell v. New Bedford, supra,* they are to be treated rather as beyond the scope of the rule than as exceptions to or qualifications of it. For while the rule absolves a municipality discharging sewage into a tidal river under the authority of the State from the charge of maintaining a nuisance, it does not protect it where through negligence or a wanton disregard of public or private rights it does in fact create a nuisance, or actually invades private property. But as there is no evidence of any negligence or misconduct in this case, it follows that the acts complained of do not constitute a nuisance, if done under the authority of the State.

In support of its contention that it was authorized by the State to discharge its sewage into the tidal waters adjacent to the City of Annapolis, appellee relies upon the Act of 1914. But as by its express provisions that act was not to become effective unless an ordinance providing for a loan of $50,000 was passed by the Mayor, Counselor and Aldermen of the City of Annapolis and ratified at a special election called for the purpose, and as it does not appear that any such ordinance was passed, we find no force in that suggestion.

It does appear, however, that by section 40 of Melvin's Code of Anne Arundel County "the city shall have power to enact all laws and ordinances to pave, construct and keep in repair all necessary drains and sewers; to pass all necessary regulations for the regulation, repair and preservation of the same." And by article 43, section 335, of the Code, codifying chapter 810, Acts 1914, it is provided that no municipality shall install a sewerage system for public use, or materially alter any existing system, without a permit from the State Board of Health, and that no such permit shall be granted until complete plans and specifications of the proposed alteration or extension have been submitted to and approved by that agency.

Construing these statutes together, they are sufficient to authorize the State Department of Health, in the exercise of a power validly delegated to it by the Legislature, to assent on the part of the State to the discharge of sewage into Spa

Creek. And since it appears that since 1914 the State Department of Health has expressly authorized the construction of new sewers which discharge their effluent into those waters, and as the sewage from the State House and other State property is and for a long time has been discharged through these sewers into the same waters, it may be reasonably presumed that the State has not only expressly assented to that use of Spa Creek by the appellee since 1914, but it may also be inferred that it ratified the acts of the appellee in constructing prior to 1914 sewers discharging into it. Our conclusion therefore is that the acts of which appellant complains do not constitute a nuisance, that it is not entitled to the relief prayed, and that its bill was properly dismissed. It follows that the decree appealed from will be affirmed.

*Decree affirmed, with costs.*