ROBERT H. LIVEZEY *v.* TOWN OF BEL AIR

[No. 22, April Term, 1938.]

*Decided June 13th, 1938.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Frederick Lee Cobourn* and *A. Freeborn Brown,* for the appellant.

*Robert H. Archer* and *Bernard S. Needle,* with whom were *Edwin H. W. Harlan,* and *Tydings, Sauerwein, Levy & Archer,* on the brief, for the appellee.

SHEHAN, J., delivered the opinion of the Court.

During the year 1935, the town of Bel Air, a municipal corporation, constructed a general system of sanitary sewers and built a disposal plant in connection therewith, under the authority contained in the Acts of 1927, chapter 254, and chapter 1 of the Acts of the Special Session of 1933. In these acts, the corporation is author-

ized and empowered to acquire by condemnation such property or rights as are necessary or proper for them to possess in the construction of the sewer system and disposal plant.

The plant is situated on lands near the property of Robert H. Livezey, the appellant, and is located on a stream of water known as Bynum's Run, which courses through the meadow and pasture lands of the appellant, who filed his bill of complaint against the corporation, alleging: "That he is the owner of two tracts or parcels of land situate and lying in the Third Election District of Harford County, State of Maryland, and near the corporate limits of the Town of Bel Air, containing one hundred and eighteen (118) acres of land, more or less, upon which said tract of land he operates a farm and dairy, and has so done for more than fifteen years past; that a large part of said tract consists of valuable pasture land upon which your Orator grazes a large herd of milk cows, the produce of which herd is sold for distribution to and consumption by the general public; and said pasture land is also used for grazing horses, mules and other domestic stock and animals; that Bynum Run, a living, natural, fresh water stream flows through the plaintiffs' property and through said pasture land for a distance of more than one-third of a mile, and said stream has flowed through said property during all the years of the plaintiff's ownership thereof and for so many years theretofore that the memory of man runneth not to the contrary; that, prior to the wrongs hereinafter complained of, said Bynum Run was a stream of pure, fresh water, which was used by your Orator in the management and operation of his said farm and dairy, for the watering and caring for of all domestic stock on said farm, and for all general farm and dairy purposes."

There are further allegations in the bill, charging that irreparable loss and injury has been done the plaintiff, and that because of the nature of the damages there is not an adequate remedy at law. The bill contains a

prayer for an injunction restraining the defendants from polluting and contaminating the stream, and a prayer for general relief. The essential allegations of the bill, relating to the pollution of the stream, are denied in the answer. The relief prayed was denied by the chancellor, and the bill dismissed, and from the decree this appeal is taken.

The questions here presented are: First, do the effluent and substances discharged from the disposal plant into the stream contaminate and pollute it as alleged; second, does that discharge cause such harm to the appellant's property interests as warrants relief by injunction?

Testimony at great length was taken by the complainant to support the allegations of the bill, and substantially all the persons living along the stream, from the disposal plant for a considerable distance, testified as to its polluted condition. Many of them described the foul and offensive condition of the stream and the odors at times arising therefrom, the annoyance and injury caused thereby, both to persons living along it and to horses and cattle that graze in the meadow, and the total destruction of fish therein. They described too the effect of the pollution on the use of the stream for bathing and fishing, watering of horses and cattle, the health of cattle watering therein, and on the health of children who drank milk from such herds, and that testimony is not contradicted by any witness living in that vicinity. The conditions thus described constitute an actionable nuisance. *Taylor v. Baltimore,* 130 Md. 133, 99 A. 900, and cases there cited. In that case, it is stated that (page 905) : "The nuisance may consist in: (1) The pollution of the water to the injury of a riparian owner; * * * (2) the pollution of the air by creating noxious odors; or (3) the deposit of filth on the banks of the stream or pond." All such acts are alleged and, by the weight of testimony, proven in the instant case.

It is further shown that, prior to the installation of the sewer system and the building of the disposal plant, the conditions complained of did not exist to the same

degree. It was further shown that, when the cattle were removed from the meadow through which the stream flows to other pasture lands, they recovered from their sickness and general bad condition, as did the children who drank their milk. The condition of the water of the stream, and its general appearance and condition as set forth in the evidence, was further described by Dr. William B. D. Penniman, a chemist. His testimony in part was that: "The suspended organic matter was extremely high, and that resulted in a condition of affairs that was certainly, from time to time, as has been described by the various witnesses that I have had occasion to listen to since I have been in court here. I have heard all the witnesses testify as to the material conditions of the stream, and since that first visit I have again gone over the stream—yesterday in fact—and verified the evidence that the water in the stream, in spite of the efforts made, has not been entirely purified. It is contaminated because the black floating material in the sewage disposal plant gets into the stream, occasionally, and, when it does get into the stream, that is sufficient to contaminate it. There is sewage matter on the bank of the stream along this property (here indicating) * * * I walked this stream from end to end and have a general familiarity with its character, and it is as pretty a country stream as we have. In the comparative quiet stretches of the water, there is evidence of a deposit of sewage material, which only awaits the right condition in temperature to again become active and give rise to an offensive condition—offensive to man, beast, and fishes of the stream. At the present time the stream is badly contaminated below the plant; and, as far as I can say now, I am certain that it will continue to be in that shape unless there is a radical change in both the method of operation and the plant itself."

This witness further testified: "Q. You have heard the witnesses describe the condition of that run since the operation of the Bel Air sewage disposal plant? A. Yes. Q. Are you able to say from your examination

and observation of that run, that the condition of this stream as described by these witnesses is the direct result of the effluent discharged into this stream from the Bel Air sewage disposal plant? A. I am absolutely certain of that. Q. Are you certain that the condition is caused by the Bel Air sewage disposal plant? A. Yes, sir."

The polluted condition of the stream complained of existed from the time of the construction of the sewers and disposal plant, in December, 1934, to the time of the filing of this bill, in December, 1936, and continued until the taking of the testimony and the hearing before the chancellor, in September, 1937.

The only witness offered on the part of the defendant was Dr. Abel Wolman. He testified, in effect, that the system in question was constructed under the supervision of the State Board of Health, of which he was chief engineer. He stated that the plant is sufficient in size and capacity to dispose of the sewage of the town, and, if properly managed, and operated, the conditions complained of could not occur. But he did not deny that the conditions, as shown by the witnesses for the plaintiff, did exist, nor did he contradict the findings of Dr. Penniman, but in most cases confirmed them. Dr. Wolman dealt with what could or could not be done rather than that which was being done, and the damage that had been occasioned. His testimony was quite lengthy and should not be repeated in full in this opinion, but some of his observations and conclusions may be set forth. The polluted condition of the stream at the time of the hearing was not questioned by him, but rather, in support of that and other facts, he described how such conditions could be brought about "during the tuning up period of the plant," but this condition of the stream had lasted for about two years, according to the undisputed evidence in the case. And it could have occurred by inefficient management and want of proper attention, so we have the cause and effect of some condition at the plant, the one giving support to the other, but both contributing to the injury of the appellant.

It was admitted that from the time the plant was put in operation in December, 1934, until December, 1936, it did discharge into Bynum Run an effluent of a quality that probably did pollute the stream, and that the two elements contributing to this was the tuning up of the plant and the inefficient operation of it, and that if the plant was inefficiently operated it would cause trouble. Dr. Wolman's opinion was that the plant, at the time of the taking of testimony and the hearing had, was efficiently operated, and that the appellant was not being injured by the condition of the stream, but the value of his opinion is affected by the fact that he had not observed the stream below the plant. On the other hand, Dr. Penniman had observed the stream above and below the disposal plant, and had also made chemical tests of the water immediately preceding the hearing, with the results stated above.

Because of these conditions, by the decided weight of the testimony, the property rights of the complainant have been substantially impaired and injured, without just compensation, and they have continued for a long time in varying degrees. For this invasion of plaintiff's rights he is entitled to a remedy. This being true, the question is whether he is entitled to relief by injunction or has he adequate remedy at law.

Beginning with the earlier cases respectively the rights of riparian owners, such rights are defined in the case of *Baltimore v. Appold,* in 42 Md. 442, where it is said that: "The right of every riparian owner to the enjoyment of a stream of running water in its natural state, in flow, quantity and quality, is too well established to require the citation of authorities. It is a right incident and appurtenant to the ownership of the land itself, and being a common right, it follows that every proprietor is bound so to use the common right as not to interfere with an equally beneficial enjoyment of it by others. This is the necessary result of the equality of right among all the proprietors of that which is common to all." In the case of *Woodyear v. Schaefer,* known as the slaugh-

terhouse case, in 57 Md. 1, at page 12, the court affirms and restates in terms the principle laid down in the *Appold* case. These cases, together with *Taylor v. Baltimore, supra,* are authority for the holding of such a condition as is here presented as constituting a nuisance, as above defined. The rights of riparian owners of property, with respect to pollution of natural streams, is further considered in the case of *Baltimore v. Warren Mfg. Co.,* 59 Md. 96; *Neubauer v. Overlea Realty Co.,* 142 Md. 87, 120 A. 69; *Caretti v. Building Co.,* 150 Md. 198, 132 A. 619, and the rights of riparian owners to redress for injuries of the character described in this case has always been recognized here and elsewhere. 2 *Addison on Torts,* sec. 1088; 28 *Cyc.* 1293; 2 *Dillon on Municipal Corporations* (5th Ed.) 1040. In *Taylor v. Baltimore, supra,* Chief Judge Boyd, in speaking for the court, after a lengthy discussion and summary of cases, said: "What seems to be the decided weight of authority holds that a municipality in making its drains and sewers is not immune if it so constructs or maintains them as to amount to a nuisance. Indeed, in the case just referred to, Judge McSherry said: 'Where commissioners of sewers and boards of health have obtained statutory powers of drainage into rivers, streams, and natural water courses, the power must be exercised so as not to create a nuisance or interfere with the private rights of individuals. 2 *Addison on Torts,* sec. 1085. The mere power to erect and maintain hospitals and pesthouses does not imply or include the further power to erect and maintain them in such a way or at such a place as will cause injury to others.' " *Baltimore v. Fairfield Improvement Co.,* 87 Md. 352, 39 A. 1081; *McQuillin on Municipal Corporations,* sec. 2697; 28 *Cyc.* 1293; and the court further laid down the principle in *Taylor v. Baltimore, supra,* at page 148, 99 A. at page 905, that: " '* * * a municipal corporation has no more right to erect and maintain a nuisance on its own land than a private individual would have to maintain such a nuisance on his land; it is entitled to exercise the same rights in respect

to the use of its property as an individual, and any lawful use thereof, or the doing of those things which the law authorizes, cannot, it is held, amount to a nuisance in itself, although the execution of the powers may be in such a manner as to result in an actionable nuisance.'  Again on page 1323 of that volume it is said: 'If a municipal drain or sewer is so constructed or maintained as to amount to a nuisance, the municipality is liable in damages therefor.' "

The same principles of law are adhered to by this court in *Caretti v. Building Co., supra*. There the remedy by an injunction was sought and granted, with certain reservations, to restrain the emptying of sewage into a stream of water known as Herring Run, which flowed through the plaintiff's lands, polluting it and depriving him of its ordinary uses by preventing bathing and the watering of cattle and geese.

In the case of *Neubauer v. Overlea Realty Co., supra*, the facts are almost identical with those in *Caretti v. Building Co., supra,* and in each of these cases the remedy by injunction was approved.

The case of *Taylor v. Baltimore, supra,* is authority for the principle (which was the important question in the case) that a municipal corporation, though authorized by the Legislature to erect, operate, and maintain a sewerage disposal and filtration plant, may not create a nuisance and if, in the operation of such a plant, a nuisance is created, the city is responsible to those whose property is injured.  If such an injury is occasioned, a suit at law may be maintained for the damages done. *Baltimore v. Merryman,* 86 Md. 584, 39 A. 98; *Guest v. Church Hill,* 90 Md. 689, 45 A. 882.  And an injunction may in a proper case also be an appropriate remedy to abate such a nuisance and to prevent its recurrence. *Caretti v. Building Co., supra; Neubauer v. Overlea Realty Co., supra; Woodyear v. Schaefer, supra; Baltimore v. Warren Mfg., Co., supra,* and *Baltimore v. Appold, supra.*

In the early case of *Hamilton v. Whitridge,* 11 Md.

128, it is said that equity is available whenever injury will continue or a permanent mischief will occasion a substantial recurring grievance. And in the later case of *Baltimore v. Appold, supra,* it was stated that "The jurisdiction of Courts of Equity in cases affecting the rights of riparian owners, is well established, both in this country and in England, and rests upon the necessity of granting relief to prevent permanent and lasting injury; or where full and adequate relief cannot be had at law, or where it is necessary to prevent a multiplicity of suits, and vexatious litigation." In *Woodyear v. Schaefer, supra,* a restatement of this proposition was made, as follows: "And the doctrine is well settled that where the nuisance operates to destroy health, or impair the comfortable enjoyment of property, an action at law furnishes no adequate remedy, and protection by injunction must be given. *Daniell's Ch. Pr.,* 1858; 2 *Story's Equity,* 926; (*Garner v. Village of Newburgh*) 2 *Johns,* Ch. (N. Y. 162) 166."

A municipality, in establishing drains and sewers, is subject to liability if it so constructed and maintained them as to create a private nuisance, so as to injure another in the use and enjoyment of his property. In view of these conclusions, it follows that, in wholly denying the relief prayed and in dismissing the bill, there was error, and the decree from which this appeal is taken must be reversed.

It may be conceded that the municipality is liable to the appellant for harm caused to his interests in the stream polluted by its sewerage system. That liability may be enforced by an action at law, or in a proper case by injunction. *Cityco Realty Co. v. Annapolis,* 159 Md. 148, 155, 150 A. 273; *McQuillin on Municipal Corporations,* secs. 1586, 1557, 954, 955, 2880; *Baltimore v. Fairfield Imp. Co.,* 87 Md. 352, 360, 39 A. 1081; *Block v. Baltimore,* 149 Md. 39, 56, 129 A. 887; 20 *R. C. L., Nuisances,* sec. 93.

Injunctive relief should not be granted except on a clear and satisfactory showing of grave and irreparable

injury to private rights, and, where the effect of the injunction will be to endanger the public health and security, no injunction should issue until the municipality is given an opportunity of abating the injurious conditions by adopting some substitute, by correcting any faults in the operation of the system, by acquiring the property damaged, or by other appropriate measures. In such a case, the doctrine of balancing equities, by which consideration may be given to the relative gravity of the harm which the injunction will inflict on the public if it is issued, and the harm which the complainant will suffer if it is refused, may be invoked. 46 *C. J.* 774; *Huebschmann v. Grand Co.,* 166 Md. 615, 620, 621, 172 A. 227; *Taylor v. Baltimore,* 130 Md. 133, 146, 99 A. 900.

It is obvious that the sudden abandonment of a sewerage system designed and used to afford to a town of the size of Bel Air facilities for the disposal of its sewage and household waste might well result in the generation and spread of pestilence and disease, whereas the inconvenience to the complainant is largely delay in recovering compensation for the harm to his interests.

While, therefore, there was error in dismissing the bill in this case, nevertheless, no injunction should be issued until the municipality is given a reasonable time in which to correct the conditions of which the appellant complains. The bill should, therefore, be retained with leave to the appellant to renew his application for an injunction unless within some time to be fixed by the trial court the cause of his complaint shall have been abated, which can be decided in the light of conditions existing at that time.

In adopting this course of procedure we follow that laid down in *Wisconsin v. Illinois,* 278 U. S. 367, 49 S. Ct. 163, 73 L. Ed. 426; *Potomac Electric Power Co. v. Wall,* 153 Md. 229, 137 A. 891, and *Caretti v. Building Co., supra.*

> *Decree reversed with costs to the appellant, and cause remanded to the end that further proceedings may be had in accordance with this opinion.*