GAULT et al. v. TRANSCONTINENTAL GAS PIPE LINE CORP.

No. 5349.

United States District Court D. Maryland. Civil Division.

Jan. 18, 1952.

Paul F. Due, B. Conway Taylor, Jr., and Due, Nickerson, Whiteford & Taylor, all of Baltimore, Md., John L. Clark, Ellicott City, Md., for plaintiffs.

Clarence W. Miles, Miles, Walsh, O'Brien & Morris, Seymore O'Brien, and Harrison L. Winter, all of Baltimore, Md., William H. Davidson, Jr., Houston, Tex., for defendant.

CHESNUT, District Judge.

The plaintiffs in this case filed a suit in the Circuit Court for Howard County, Maryland, to enjoin a noise and vibration nuisance. It was duly removed to this court and has been heard on the pleadings, oral evidence wholly taken in court, and exhibits, and submitted for decision. The plaintiffs are owners of very substantial residence and farm properties in Howard County situated about 15 miles from Baltimore City and about 5 miles from Ellicott City, the nearest town. The area is a quiet rolling countryside within about 2 miles of the well-known historic Doughregan Manor, the manor site of Charles Carroll of Carrollton, one of the four Maryland signers of the Declaration of Independence. The defendant is a natural gas company incorporated under the laws of Delaware, engaged in interstate commerce in the transmission by pipe line of natural gas from Texas to New York. It has obtained requisite authority from the Federal Power Commission to construct and operate its transmission line through various States, including the State of Maryland. Two or three years ago it acquired 24 acres of land in Howard County for the purpose of erecting thereon and operating a "booster" or compressor gas station necessary for and incident to the exercise of the authority conferred upon it by the Federal Power Commission. It also obtained a revision of the zoning regulations of Howard County for construction of the compressor plant. The nuisance complained of by the plaintiffs consists in excessive noise and vibration caused by the plant. From the evidence in the case I find the material facts as follows:

1. The compressor plant was designed by a Texas engineer, experienced in such matters, and was efficiently designed and constructed to do the work for which it was intended, which is acting as a booster station for the pumping of the natural gas through a thirty-inch main buried underground; but the design and construction of the station with respect to the elimination of noise and vibration was apparently not considered with particular reference to the effect that it might have on nearby

residences. The building consists of a structure about 40 feet wide by over 200 feet long and 30 feet high. It is built in a natural small valley beside an adjacent stream for water supply, and the residences of the plaintiffs are about 1650 to 2050 feet distant respectively from the station and situated on hills or knolls 50 to 60 feet above the elevation of the station and to the southeast or east thereof. The conformation of the land is such that it tends to increase the noise and vibration from the station which affects the plaintiffs as property owners.

2. The functions and operation of the compressor plant are, from the mechanical standpoint, not unlike the operation of the modern automobile. The natural gas is led by pipes outside of the building into the building and is there mixed with cleaned air which comes in from large intake outlets on the outside of the building, and the mixed gas and air are exploded by gas engines, the exhaust pipes from which are also on the outside of the building. The final result of the operation of the machinery is to pump the natural gas forward and northeastward through the 30-inch main on toward Philadelphia and New York. The exterior walls of the building are not of brick or other solid substantial material but consist of a substance known as "Transite" only a quarter of an inch thick, and the windows in the building are generally left open for greater safety in operation and to avoid the effect of a possible explosion. There are seven large engines in the building each having a horse power of 1760, and they are excessively noisy in operation so that conversation is not possible within the plant unless the speaker shouts almost into the ear of the hearer. In the operation of the machinery there are loud noises resulting from the large air intakes and from the mufflers, both of which are situated on the outside of the building toward the plaintiffs' residences. There is also observable vibration from some parts of the machinery.

3. When the defendant applied to the Zoning Commissioner of Howard County for an amendment of the regulations to permit the erection of the plant, reference was made to what would be the resulting noise as affecting the nearby residences, and an authorized representative of the defendant said that the noise would be negligible and practically not audible at a distance of 1500 feet. The plaintiffs owned their respective properties for some years prior to the erection of the compressor plant. Their residences are substantial and were comparatively costly in construction. The residence of one of the plaintiffs cost over $100,000 to build, and another cost about $35,000. The compressor station was first operated in March 1951. The excessive noise and vibration was at once experienced by the several plaintiffs and vigorous and repeated complaints were made to the defendant over a period of several weeks thereafter. The defendant was apparently surprised at this result but promptly consulted "sound" engineers and requested advice as to what could be done to remedy the situation. The engineers made various suggestions, most of which were put into effect by the defendant at a cost of about $22,000; but more extensive changes were not attempted by the defendant by reason of the cost thought to be too great and with the defendant's stated view that they would probably not be effective. These changes were made during September and October of 1951. The defendant contends that the noise affecting the plaintiffs in the use of their residential property has been greatly diminished as a result of these changes. The plaintiffs, however, say that while there has been some decrease in the intensity of the noise the change has been in the quality rather than the quantity of the disturbing noise and there has been no appreciable change in the effects of the vibration emanating from the plant.

4. The effects of the noise and vibration resulting from the plant have been testified to by all of the plaintiffs. It is perhaps most clearly explained and expressed as to its effects by Mr. and Mrs. Zoller whose residence recently constructed at a cost of $35,000, is situated about 1650 feet southeast of the plant. They describe the noise and vibration as "intolerable" whereby the windows rattle, there is a "hum" in

the air, a heart-palpitating sensation and interference with sleeping. The particular complaint is that the noise and vibration is incessant, practically 24 hours a day. Mr. Zoller has been obliged for comfortable reading and quiet to spend his evenings in the basement of the house as he cannot sit in comfort in his living room or den on the ground floor. The noise seems to increase at night as compared with the day time. Occasionally there is very annoying smoke and soot which apparently emanates from the burning of surplus gas or oil from the premises on or near the compressor plant. The noise is also described as like that emanating from a railroad train going over a trestle, as a percussion sound or a rumbling as of an approaching airplane. When the wind is from the southeast, that is blowing toward the plant and not away from it, there is some relief. The noise and vibration was so annoying last summer that the Zollers spent the summer at a small residence property that they own on the Severn River, but which they had expected to sell when their new home was constructed in Howard County. Mrs. Zoller described the sensation of the vibration in the ears as like that experienced on an ocean liner. Other witnesses gave similar descriptions of the effect of the noise and vibration such as the rattling of windows and at times of metal dishes in the kitchen. Another plaintiff described the general effect of the noise and vibration as that of a never-ending freight train of empties. The plaintiffs agree that since the changes were made at the plant there has been some lessening of the noise but the effects of the vibration are still experienced without material change. The sense of vibration is said to be due to a very low pitch of sound emanating from the plant which can be personally felt by the body but not of itself perceptible to the ear.

5. Competent real estate experts familiar with the property testified (without contradictory evidence) not only to their personal observations of the actual conditions of noise and vibration but from their expert knowledge of property, that the marketable value of the plaintiffs' prop- erties has been materially decreased by the effects of the noise and vibration in amounts from 10% to 30%.

6. There is no contradiction of the plaintiffs' testimony from neighborhood witnesses, but at least two sound engineers testifying for the defendant say that from their personal observations on or near the plaintiffs' premises the observable noise and vibration is very slight or almost negligible. Of course they did not have the experience of living on the property as do the plaintiffs, from day to day and month to month. The defendant has also offered in evidence readings taken from a sound measuring instrument which, it is contended, shows that by comparative readings made before and after the changes at the plant, the volume and intensity of sound recorded on the instruments at the plaintiffs' properties show a decrease of 75% of the original noise. These instruments, however, did not measure the effect of the vibration. After the evidence had been concluded in the case the defendant obtained permission to introduce a graph representing a recording on a vibration machine which, it is said by the defendant's expert, who conducted the experiment after the other evidence had been thought concluded, indicated only slight vibration emanating from the plant. I find that this supplemental evidence viewed as a whole in connection with other evidence in the case tends to support rather than contradict the plaintiffs' testimony with regard to vibration.

7. I consider the plaintiffs' oral evidence as to their personal experiences as to the effects of sound and vibration much more reliable than the inference or indications from the sound meter readings. The latter must, I think, be accepted only with caution because on the whole evidence relating thereto it is evident that the readings are subject to different interpretations. The defendant has introduced a number of exhibits which give interesting data with regard to the volume or intensity of sound at different places and under different conditions. The intensity of sound is recorded in units of decibels. A chart (DX 5) is to the effect that 90 or more decibels shows a "deafening noise"; 65 to 90 decibels a dis-

tracting noise, and 35 to 65 decibels noise within the range of conversation; while 35 to 20 decibels represents extreme quiet, and less than 20 decibels shows soundproof chambers. For comparison the defendant offers charts of sound meter readings tending to show that in various parts of Guilford or Roland Park (suburbs of Baltimore City) on the night of December 12th last, the sound reading meter recorded about 40 decibels, while on the outside of the premises of some of the plaintiffs the measurements in October last at night were about 40 to 45 decibels as compared with 50 to 70 decibels at the same places in April 1951; and that the decrease in decibels as recorded indicated a reduction in the noise equal to about 75%. It was also contended that by the operation of the sound recording instruments a decrease of 10 decibels would represent a drop of 100% in intensity of sound while a drop of 20 points in decibels readings would mean a decrease of sound to the extent of 100 times. Another sound meter reading made for the defendant (but introduced in evidence by the plaintiffs) was to the effect that at nighttime in the area of the plaintiffs' properties the normal decibel reading (with the plant not in operation) was about 20 decibels, while with the plant in operation the decibel reading was about 40; that is, the noise was 100 times greater at the plaintiffs' properties with the plant running than without it running. As to this, the defendant's comment is that as decibel readings in the 20's means extreme quiet, to multiply it by 100 times still does not make it noisy. But while these sound readings are interesting and are perhaps helpful for comparison, I find the personal experiences of the plaintiffs in the occupation and use of their properties much more weighty and persuasive. I am satisfied from hearing the plaintiffs that they are persons of average sensibilities, and of at least or more than average intelligence, and not exaggerating their own experiences of the effects and result of the noise and vibration.

■ 8. As an ultimate fact I find that the noise and vibration emanating from the defendant's plant has substantially and materially and prejudicially affected the plaintiffs' reasonable and comfortable enjoyment of their residence properties and has also materially diminished their marketable value.

9. I also find from the evidence that there are additional improvements and changes which can reasonably and without comparatively undue cost, be made by the defendant which, considering the expert evidence as a whole both for the plaintiffs and the defendant, can reasonably be expected to result in a material diminution of the noise and vibration nuisance experienced by the plaintiffs.

My conclusion of law is that the plaintiffs have established that the operation of the defendant's compressor plant under existing conditions constitutes a legal nuisance which entitles the plaintiffs to an injunction on conditions to be hereafter indicated.

■ As the defendant's operation is an important one in interstate commerce, the conditions on which an injunction should be issued must be carefully described to avoid material and unnecessary interference with the authorized important and legitimate continuance of interstate commerce. The defendant is a quasi public service corporation and the operation of its plant does not constitute a nuisance per se; but under the evidence justifies a measurable control in the method of operation to avoid unreasonable impairment of the plaintiffs' personal and property rights. The convenience of the public and the inconvenience and prejudice to the plaintiffs must be equitably considered and balanced. A purely temporary shut-down of the defendant's plant will, under the evidence, not seriously affect the operation of the gas transmission line, while the requisite changes in construction are being made.

■ As the principal basis for jurisdiction of this court is diversity of citizenship, the decisions of the Maryland Court of Appeals are of great if not controlling importance. In the instant case, however, it is not contended by the defendant that there are any controlling federal decisions contrary to the principles established by the Maryland cases. Perhaps the Maryland case that is most closely in point here on

the facts is that of Meadowbrook Swimming Club v. Albert, 173 Md. 641, 197 A. 146. In that case Judge Dennis (then Chief Judge of the Supreme Bench of Baltimore City) made an excellent review of the Maryland cases involving injunctions against nuisances, and his opinion in the case in favor of the plaintiffs and enjoining a sound nuisance emanating from the Meadowbrook Swimming Club on the Falls Road in a suburban district of Baltimore City, was unanimously affirmed by the Maryland Court of Appeals. Some later Maryland cases involving similar subject matter and to the same general effect are Livezey v. Town of BelAir, 174 Md. 568, 578, 199 A. 838; Mayor and City Counsel of Baltimore v. Brack, 175 Md. 615, 624, 3 A.2d 471, 120 A.L.R. 543; Five Oaks v. Gathmann, 190 Md. 348, 353, 58 A.2d 656. See also Baltimore & Potomac R. R. Co. v. Fifth Baptist Church, 108 U.S. 317, 334, 2 S.Ct. 719, 27 L.Ed. 739; 66 C.J.S., Nuisances, § 11, pp. 753, 754. The case of Boller v. Texas Eastern Transmission Co., D. C.Mo., 87 F.Supp. 603, presented a case similar in nature and objectives to the instant case; but clearly distinguishable on the facts as to damages suffered by the plaintiffs. The complaint against noise and vibration from the compressor station in that case was dismissed because the plaintiffs failed to establish damages in fact.

■ A most earnestly pressed contention of the defendant is that the operation of its plant should not be subject at this time to an injunction of any kind because its compressor station was designed and constructed and is being operated in accordance with the latest engineering practices in the industry and it is urged that the evidence is not sufficient to show that the plant was either negligently constructed or operated. But as I have found, the construction and location of the plant, while adequate for the purposes of the defendant, was apparently designed without proper consideration for the personal and property rights of the plaintiffs. If the evidence clearly established as a fact that no further improvements could reasonably be made by the defendant I think I would have to conclude that the injunction would have to

be denied in the interests of the public and relegate the plaintiffs to such other relief as they might obtain by compensatory damages. But I am satisfied from all the evidence, including that of experts for both parties, that there are still further changes in the plant construction which are possible and which give reasonable prospect of diminution of annoyance and damage to the plaintiffs. In fact the defendant has heretofore recognized that some changes could and should be made and has made some. Even the defendant's chief expert sound engineer has agreed that some of the vibratory effects from the plant's machinery can be lessened or stopped and counsel for the defendant has candidly stated that further experiments to lessen noise and vibration will be at once conducted.

■ Some of the suggested changes for improvement are (1) eliminating or diminishing vibration in gas engine pipes; (2) better "silencers" on the air-intake openings; (3) sound insulation of the mufflers and other piping; (4) change in height or location or direction of the smaller outlet pipes for the mufflers; (5) sound-proofing of the interior of the building; (6) screening by adequate high fence or trees on the outside of the plant toward the plaintiffs' residences. And there may be other or different changes that further experimentation by the defendant will suggest. I do not think that the defendant is entitled to spare any reasonable expense in making these changes. The Texas engineer for the defendant who designed the plant stated as a witness that other changes which have been suggested would cost at least $70,000 and were not made by reason of the cost involved and doubt as to the efficacy of the changes. The plant as a whole cost to construct more than $2,000,000 and the cost of some or all of the changes now suggested would be comparatively small. It is regrettable that not more thought was given to the sound and vibration effect before the building was constructed. If the location of the very noisy air-intake and muffler exhausts had been placed on the other side of the building, away from the plaintiffs' property, very possibly the resultant effect would have been very materially reduced.

An interesting comparison of intensity of sound as recorded in decibels was made by one of the defendant's engineers. It tended to show (DX 4) that the reading in decibels when the sound meter was located near the entrance to the air-intake filters or near the exhaust silencer was over 100; but that when the instrument was placed on the other side of the building the reading was 10 or more decibels lower. Industry must bear the necessary expense of avoiding injury to personal and property rights.

I think the plaintiffs are entitled to an injunction in this case but on certain definite conditions: (1) The injunction is not to be in operative effect until June 1, 1952, on the condition that the defendant promptly and with all due despatch and diligence make further improvements and changes in its plant and machinery operation to further lessen the noise and vibration affecting the plaintiffs; (2) if by May 1, 1952 the defendant concludes that it has exhausted all reasonable efforts to minimize the noise and vibration, it can so report to the court by written statement filed in the case, and ask for a hearing to determine the fact, and if so determined, for a vacation or modification of the injunction or other appropriate relief. And if the court then finds that the noise and vibration emanating from the defendant's plant cannot be materially further reduced and still constitutes a substantial impairment of the plaintiffs' personal and property rights, consideration can be given to a determination of what other relief, such as pecuniary damages, can be awarded the plaintiff in lieu of an injunction which would seriously interfere with public interests.

The evidence in the case also establishes that at times the plaintiffs have been annoyed by smoke and soot and disagreeable odors resulting from the burning of waste products on the defendant's premises. Apparently this can be remedied or avoided by reasonable efforts by the defendant. The injunction should also enjoin the defendant from unnecessary annoyance to the plaintiffs in this respect.

Counsel are requested to promptly submit a draft of appropriate decree.