· (Decided January 4th, 1898).

# THE MAYOR AND CITY COUNCIL OF BALTIMORE *vs.* ELLEN MERRYMAN.

*Riparian Owner—Overflowing Land by Obstructions in Stream— Damages—Dam Erected by Municipal Corporation Under Legislative Authority—Taking of Property.*

Defendant, a municipal corporation, in providing its water supply, ʹ under legislative authority; constructed a large dam across a stream four miles below plaintiff's farm which was bounded by the stream. Defendant negligently allowed large quantities of debris and mud to accumulate and remain above the dam whereby the stream became filled up and the water was made to overflow plaintiff's farm, depositing thereon sand and mud and destroying crops, fences, etc. The erection of the dam permanently raised the water in the stream along plaintiff's farm a foot or more higher than it had been. *Held*,

1st. That the raising of the water in the stream along plaintiff's property was a taking of the same within the constitutional prohibition.

2nd. That the defendant is liable for the damage resulting from the overflow of plaintiff's land if caused by its negligence in allowing obstructions to accumulate in the stream.

3rd. That the fact that the defendant constructed the dam under legislative authority did not relieve it from liability for the injury to plaintiff's property.

In an action for overflowing plaintiff's land, damages arising after the institution of the suit may be recovered when they are the natural and necessary result of the act complained of.

Appeal from a judgment of the Circuit Court for Harford County (WATTERS, J.), to which Court the case had been removed for trial from the Circuit Court for Baltimore County. At the trial the following prayers were offered :

· *Plaintiff's Prayer.*—If the jury shall find in favor of the

plaintiff, then, in considering the amount of damages to be given by their verdict, while they may not take into consideration any overflows or floodings of the plaintiff's land which have occurred since the institution of this suit, nor the consequences thereof, yet they may take into consideration such overflows and floodings of said lands, if any, which they may believe to have occurred within three years before the institution of this suit, because of the acts and neglects of the defendant complained of, and allow to the plaintiff such sum as they may believe will compensate her for the damage and injury which they may believe she suffered from such causes, including compensation for injury to her land (if they find there was any), naturally and necessarily resulting from such overflows and floodings thereof during said period of three years, except such damages as the plaintiff could have prevented by reasonable expense and trouble to avoid the same.    (Granted).

*Defendant's 1st Prayer.*—If the jury find that the dam and lake referred to in the evidence were carefully planned and built, and thereafter carefully maintained and kept by the defendant, and that the injury to plaintiff's meadow and farm land referred to in the evidence was caused by one or more extraordinary freshets which raised the water in the Gunpowder River and caused the back water upon and flooding of her lands (if they find such back water and flooding), then they can find in favor of the plaintiff for nominal damages only, and by an extraordinary freshet is meant one the like of which had not before happened on said river.    (Granted).

*Defendant's 2nd Prayer.*—If the jury find that the injury to her meadow and farming land complained of by the plaintiff was caused partly by the back water from the defendant's dam and partly by the obstruction to the flow of said stream in high water by the Meredith's Ford Bridge, its abutments, wing-walls and approaches (if they find such obstruction) and they are unable to find which part of said damages resulted from either of said causes, or to appor-

tion the same, then they can find in favor of the plaintiff for nominal damages only.   (Granted).

*Defendant's 3rd Prayer.*—Before the jury can find a verdict in favor of the plaintiff for more than nominal damages, they must find that the injury to her meadow and farming lands complained of by her was directly caused either by back water from the defendant's dam or by the overflow of the Gunpowder River resulting from said back water ; and if they find that the bridge at Meredith's Ford and its approaches directly contributed to produce said injury, then they can only allow the plaintiff nominal damages.   (Granted).

*Defendant's 4th Prayer.*—If the jury are unable to find from the evidence whether the injury to her meadow or farming lands complained of by the plaintiff was caused by back water from the defendant's dam or the overflow of the Gunpowder River resulting from said back water or whether it was caused by the obstruction of the Meredith's Ford Bridge, its abutments, wing-walls and approaches (if they find such obstruction), then their verdict can be for the plaintiff for nominal damages only.   (Granted).

*Defendant's 5th Prayer.*—If the jury find that at times during the three years next prior to the institution of this suit, the Gunpowder River arose out of its banks and went upon the low lands of the plaintiff adjacent thereto and that thereby deposits of mud and sand were made upon said land, and that pools of water remained thereon for a considerable length of time after the river had fallen, and that the said deposits and the duration of said pools were directly caused by the damming of said water by the abutments, wing-walls and approaches of the Meredith's Ford Bridge (if they find such damming), then their verdict must be in favor of the plaintiff for nominal damages only.   (Refused).

*Defendant's 6th Prayer.*—If the jury find injury to plaintiff's meadow and low lands within three years next prior to the bringing of this suit and that the same resulted

from overflows of the Gunpowder River within said period, and that said overflows were directly caused by extraordinary freshets, then their verdict can be in favor the plaintiff for nominal damages only. (Refused).

*Defendant's 7th Prayer.*—If the jury find in favor of the plaintiff for more than nominal damages, then they can only allow her for such damage to her meadow and farm lands as she suffered within three years prior to February 10th, 1896. (Refused).

*Defendant's 8th Prayer.*—In estimating the damages to plaintiff's land within three years prior to February 10th, 1896, the jury are not at liberty to consider or allow her for depreciation in the sale value of said land by reason of the overflow complained of by her, but can only allow her for actual loss of rents or profits directly caused by said overflows during said years. (Refused).

*Defendant's 9th Prayer.*—The defendant prays the Court to instruct the jury, that under the pleadings and evidence in this case, the plaintiff is not entitled to recover more than nominal damages. (Refused).

The jury returned a verdict for the plaintiff for $2,500, and there was a judgment thereon.

The cause was argued before McSHERRY, C. J., BRYAN, FOWLER, PAGE and BOYD, JJ.

*Thos. Ireland Elliott, City Solicitor* (with whom was *Thomas G. Hayes, City Counsellor*, on the brief), for the appellant.

The appellant will contend: (1.) That by virtue of and in accordance with the power granted it by law for the purpose of creating and maintaining a water supply for its inhabitants, the Mayor and City Council of Baltimore had a right to acquire possession of the banks and bed of the Gunpowder River under and adjacent to Lock Raven.

(2.) That incident to the acquisition and ownership of the bed and banks of said stream the Mayor and City

Council of Baltimore had the right to erect a dam across said stream at a point where the present dam is erected and to maintain that dam in perpetuity for the purpose of creating a storage lake from which to conduct water to the city of Baltimore.

(3.) That the Mayor and City Council of Baltimore having the right to erect the dam and to create and maintain the lake could not be held responsible for any results happening directly or indirectly from their existence, unless those results happened by reason of an improper or negligent construction or from a careless and wrongful maintenance thereof.

(4.) That no plaintiff could recover damages for any injury happening from an overflow, even though it might have been caused by the existence of the dam and lake, unless that plaintiff made it to affirmatively appear that the overflow would not have occurred except for the negligent and careless construction of the dam and the improper condition of the lake.

(5.) That there was no evidence in this case to show any negligent or careless construction of the Lock Raven dam, and that therefore the jury had no right to have had submitted to them the testimony in the case for the purpose of reaching a verdict, in so far as the fact or result of said verdict was made to depend upon such negligent or careless construction.

(6.) That there was no evidence whatever in the case connecting the Mayor and City Council of Baltimore with the overflow of plaintiff's lands, except to the extent of a suggestion that said overflow was caused by the gradual filling up of the lake with sediment in place of the water which had been there before the sediment was deposited.

(7.) That there was no evidence whatever in the case to show, and it would have been a philosophical impossibility to have shown, that the natural level of the water was raised any higher by the sediment of sand and mud than it would have been by so much water occupying the same

space. The philosophical fact is that the height of water in the stream above the dam depended upon the height of the dam, and that never changed.

(8.) That the only positive testimony in the case, even including that offered by the plaintiff, was to the effect that the overflow of plaintiff's land had occurred at, during and by reason of unusually high water which was not held back by either the dam or the deposits in the lake, but first flooded the plaintiff's land and then passed down through the lake and over defendant's dam.

(9.) That there was no evidence in the case to show that the deposits in the lake were higher than plaintiff's land, or that when those deposits were completely submerged the water had yet reached the level of said land and therefore there was no evidence whatever in the case to connect the fact of the deposits with the result of the overflow.

*John I. Yellott* and *Osborne I. Yellott* (with whom was *Geo. L. Van Bibber* on the brief), for the appellee.

The appellee contends : 1. That the city did not have the right to build the dam as it is.

2. That there was an actual taking of several inches on the side of the bank of the stream.

3. That the city is liable for such consequential damages as are complained of in this action as the direct result of the construction of the dam and the lake.

4.. That even though the city had the right to build the dam at the point referred to, yet it had no greater rights on said stream than an ordinary riparian owner would have, which rights it has exceeded.

5. That even though it had the right to erect a dam for the purpose of furnishing its inhabitants with water, it has been guilty of negligence and lack of skill both in the building of the dam and the construction of the lake.

6. That even though it had the right to build a dam and construct a lake as aforesaid, yet it has been guilty of negligence in allowing the lake to become and remain filled up, and is liable for the consequences of such negligence.

BOYD, J., delivered the opinion of the Court.

The appellee is the owner of a farm in Baltimore County, bounding on a running stream of water called the "Great Gunpowder Falls." The appellant completed in 1881 the erection of a dam across this stream, about four miles below the appellee's farm. The dam is a stone structure twenty feet high above the natural bed of the stream, and the water is backed up by it about eight hundred or a thousand feet north of Meredith's Ford Bridge, which crosses the stream at the lower end of this farm. The plaintiff claims that the erection of the dam obstructed the flow of water along her farm, forced it back upon it and thereby caused large deposits of sand, mud, dirt and debris to collect and gather in the bed of the stream, which the defendant *negligently* permitted to remain there, whereby the stream became obstructed, filled and choked up to such an extent as to cause the water to overflow her farm and destroy the fencing, the crops and vegetables growing on it, and large deposits of sand, mud, dirt and filth to remain on it. It is also alleged that the defendant became the owner and possessor of the bed of the stream, the bank thereof and the land contiguous thereto on either side for several miles below this farm. The dam and improvements were made in connection with the water supply of the defendant, the water being drawn from the lake into a conduit and eventually taken into the city. The plaintiff offered evidence tending to prove the above facts and also that the water in the stream along her land is now a foot, or more, higher than it was before the dam was built. At the conclusion of the plaintiff's testimony, the defendant offered two prayers. The first asked the Court to instruct the jury that under the pleadings there was no legally sufficient evidence to entitle the plaintiff to recover, and the second that under the pleadings there was no legally sufficient evidence to entitle the plaintiff to recover more than nominal damages. Both were rejected, and will be considered together.

That these prayers were properly rejected, we think can

admit of no reasonable doubt.    It is true that the defendant
was acting under powers granted it by the Legislature when
the dam and lake were made, but if in building them it
caused the water to flow back and remain on the plaintiff's
property, or any part thereof, we can understand no reason
why it could not be made to respond in damages for the
injury sustained thereby.    It is proven that the erection of
the dam raised the water a foot, or more, higher than it
formerly was on the bank of the stream along plaintiff's
property.    If that be true, and if this bank belonged to the
plaintiff, as we understand to be conceded, although the
record furnishes but little evidence on that subject, then
there was undoubtedly a "taking" of some of her prop-
erty, for which she was entitled to compensation.    The de-
fendant had no more authority to take a part of the bank
of the stream, if it was the plaintiff's property, by cover-
ing it with water and keeping it so covered for its own pur-
poses, than it would have to go beyond the bank, excavate
the plaintiff's land, flood it with water and use it as the
testimony shows other lands were used lower down the
stream in making the lake.    If it had been deemed neces-
sary or proper to erect a dam or other structure on this
property, in connection with this improvement, no one
would suppose that it could be done without compensating
the owner, and it seems to us to be equally clear that the
plaintiff's land, or a part of it, cannot be taken for storage
of water, for after all that was what was done so far as the
bank is concerned, without just compensation.

The allegations in the declaration are that the dam, etc.,
of the defendant, caused large deposits of sand, mud, dirt,
etc., to collect and gather in the bed of the stream, and that
the defendant *negligently* and carelessly suffered and per-
mitted such deposits to remain in the bed of the stream,
where it flowed through and over the lands of the defendant
for and during three years and until the institution of this
suit, so that the stream became and continued all that time
obstructed, filled and choked up to such extent as to cause

the waters thereof, which would otherwise have freely flowed off and down said stream, to be backed up and to overflow the farm, and the testimony tends to establish these allegations.   Is it to be said that a municipal corporation can thus interfere with the rights of others and injure their property, without being liable in damages, merely because it, in constructing its works, is acting under legislative authority ? The Legislature has no power to grant such rights to any corporation, public or private.   In the familiar case of *Pumpelly* v. *Canal Company*, 13 Wall. 166, the Supreme Court of the United States, after referring to the doctrine that for a consequential injury to the property of the individual, arising from the prosecution of improvements of roads, streets, rivers and other highways, for the public good, there is no redress, said " it remains true that when real estate is actually invaded by superinduced additions of water, earth, sand or other material, or by having any artificial structure placed on it, so as to effectually destroy or impair its usefulness, it is a taking, within the meaning of the Constitution, and that this proposition is not in conflict with the weight of judicial authority in this country, and certainly not with sound principle."   So much of the plaintiff's property, therefore, as is covered by the water, would seem to be clearly taken within the meaning of the constitutional prohibition.

But, as we have seen, the declaration alleges that the defendant *negligently* permitted these large deposits of sand, etc., to remain in the stream and thereby cause the overflows which damaged the plaintiffs's property.   The testimony shows that since the erection of the dam, the bed of the stream has changed materially—formerly it had " a hard, rocky bottom, with good current, strong in some places and without deposits of sand and mud.   Now it is filled in many places some three or four feet above the surface of the water of the lake.   Some of the deposits are acres in extent, and in places you can walk across ; this filling up extends all along the stream from near the breast of the dam up to Meredith's Bridge, and in places above the bridge along the

Merryman property." The plaintiff's witnesses also testified that " overflows of the land up there are more frequent, so that now every little rain or high water raises the stream, so that it overflows its banks in many places.   *   *   A great deal of the bottom land is valueless now ; there are forty or fifty acres of the plaintiff's land injured in this way." The testimony also shows that as the current comes down the stream and strikes the still water and the obstructions in the stream, it is forced on the plaintiff's land and leaves a sand deposit. There is also evidence tending to show that the materials settling in the lake could be gotten out by dredging or flushing it. So, if it be conceded, which we by no means do, that the defendannt would not be liable for consequential damages resulting from its mere act of building the dam and lake and thus obstructing the current, there is evidence of negligence in the maintenance of the improvements. Municipalities are liable either for negligence in the construction of sewers, drains, culverts, etc., or for the negligent failure to keep them in repair, although they are only intended to carry off surface water within the corporate limits, and why should they not be responsible for negligence in not keeping what was formerly a running stream of water, thus used by them, free from obstructions that force the water on the abutting property? It will not do to argue that the deposits of sand, etc., have not injured the plaintiff, for there is evidence to the contrary, and it was stated by some of the witnesses that it had only been since the lake has been so filled up by the deposits that the plaintiff has suffered from the overflow beyond what she did prior to the erection of the dam. That evidence was, of course, for the jury.

We do not deem it necessary to discuss the question whether the mere building of the dam and lake, and thus interfering with the natural flow of the water, would be sufficient to entitle the plaintiff to recover without some negligence being proven, as the declaration does not rely

upon that, but charges negligence in both counts, and relies on the fact that the stream is choked up, as the foundation for recovery.   As there was testimony to support the allegations in the declaration, and there was evidence of substantial and not merely nominal damages before the jury, the prayers offered at the conclusion of the plaintiff's testimony were both properly rejected.

We can see no valid objection to the plaintiff's prayer. The criticism that it assumes the right of the plaintiff to recover, we think is not justified, as it expressly leaves that to the jury.   The fifth and sixth prayers of the defendant were sufficiently covered by those granted not to do any injury to the defendant by rejecting them.   The seventh is erroneous, because the plaintiff was not limited in her recovery to such damages as she suffered within three years prior to February 10th, 1896, the date of the bringing of this suit.   It is true the declaration alleges that the defendant negligently permitted the condition of things therein stated to continue "for and during three years, and up to the time of the institution of this suit," but the plaintiff was entitled to recover for any damages she suffered even after the suit, if they were the natural and necessary results of the acts done prior thereto.   *Frostburg* v. *Duffy*, 70 Md. 55.   The eighth undertook to confine the plaintiff's recovery to actual loss of rents or profits directly caused by the overflow.   There was testimony tending to show permanent injury to the land itself, loss of fences, etc., and therefore that prayer was not proper. What we have already said is sufficient to indicate that we do not think the ninth was correct.

There were some exceptions to the rulings of the Court in reference to the testimony, but we do not understand that any of them are pressed on this appeal.   The most of the bills of exception do not show what the answers to the questions were, if they were answered, and hence we cannot tell whether the defendant has been injured by them.

Finding no error in the rulings of the Court below, the judgment will be affirmed.

> *Judgment affirmed, the appellant to pay costs.*

(Decided January 4th, 1898).