MAYOR AND CITY COUNCIL OF HAVRE DE GRACE *v.* FRANK MAXA, JR., ET AL.

[No. 14, October Term, 1939.]

*Decided November 28th. 1939.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, JOHNSON, and DELAPLAINE, JJ.

*A. Freeborn Brown* and *G. C. A. Anderson,* with whom were *Clagett Bowie* and *Keech, Carman, Tucker & Anderson* on the brief, for the appellant.

*G. Howlett Cobourn* and *C. Gilbert Cooley,* for the appellees.

PARKE, J., delivered the opinion of the Court.

As the principal questions here are on a demurrer to the legal sufficiency of the plaintiffs' case, the testimony will be stated from what has been offered as tending to prove the plaintiffs' cause of action.

The plaintiffs acquired in September, 1936, a property which is on the Chesapeake Bay and lies within the corporate limits of Havre de Grace. The southern boundary of the lot is the waters of the Chesapeake Bay and its northern line borders on a public highway, known as Commerce Street, for two hundred and eighty feet. On the eastern limits of the property is a lot of Millard E. Tydings which, for a distance of three hundred feet, likewise fronts on the Chesapeake Bay and binds on Commerce Street. A stone wall had been built by Tydings along the width of the water front of his lot. Three

hundred feet east of the plaintiff's land, and binding on the eastern line of the land of Tydings is Bay View Park, a public resort, which is owned, maintained and controlled by the municipality of Havre de Grace. The park extends, in a continuous line with the northern boundary lines of the lots of the plaintiff and of Tydings, 1164 feet along Commerce Street. The eastern and the western boundaries of the park are parallel lines which extend, at right angles, south from the side of Commerce Street to the shore of the Chesapeake Bay. The western boundary of the park is about 280 feet in length and the eastern line is about 175 feet. The southern or shore line of the park in its natural condition ran from the southern ends of these two parallel lines in practically a straight line, so that the figure formed was, approximately, a right trapezium.

This, generally speaking, was the physical situation when the plantiff acquired his lot, and began the building of his house, at a cost of $35,000, and the municipality determined to improve the park and benefit the public, by extending the shore line outward to the south, and by making in front of the new shore a basin for yachts, with piers for boats. The plan was carried out in this manner. A breakwater of wooden construction was erected in the Chesapeake Bay parallel with the shore line of the park. It formed the southern boundary of the projected basin. About 500 feet north of the breakwater, and approximately parallel with it, a line of piles was driven to become the foundation of a concrete retaining wall, which is 500 feet in length and rises above the level of high tide. At either extremity of the retaining wall a bulkhead, which is constructed of wood piles and sheathing, makes an obtuse angle with the face of the concrete retaining wall, for a distance of 75 feet to 100 feet, and then this exterior line of the bulkhead runs parallel to the prolonged line of the concrete retaining wall for about 175 feet, when it curves to the north and runs until the original shore line is reached. On the west this point is 35 feet from the western boundary line of the park.

The construction described is called cribbing, and the work when done is simply a wooden retaining wall. The area to the south of the concrete and wooden retaining walls, and north of the breakwater, was shallow water, and the area to the north of the walls was marsh and water, to the original shore line of the park. To get the depth for a basin for yachts and boats between the breakwater and the walls, and to convert the area north of the walls to the old shore line into fast and solid land, the bottom of the bay, south of the walls, was required to be excavated to the necessary depth, and moved so as to cover and fill up the marsh and shallow water between the walls and the old shore line of the park.

Thus the breakwater, the concrete and wooden retaining structures, the excavation on the one side of the structures to make the basin, and the fill on the other to make solid land, were necessary, dependent, parts of a contemplated, unitary, whole.

The object of the municipality was to add to the beauty and increase the utility of the park by increasing its area, stabilizing its shore line, and providing a contiguous basin for yachts, with piers for boats. The erection of a retaining wall was the key structure of this plan. It served at once to bound and confine the north side of the basin, and to hold fast the water front and the fill to be made on its land side. The required depth for the basin and the material for the two acres of land to be made for the park were procured, as was designed, by pumping away the earth at the bottom of the bay in front of the wall, and forcing the fluid earth over the wall upon the marsh and shallow water between the wall and natural shore line of the park. Thus the essential utility of the wall was to keep the removed material in place so that it would become fast ground, and would not get back into the basin, nor escape so as wrongfully to invade and affect the property rights of others. *City of Baltimore v. Merryman*, 86 Md. 584, 39 A. 98.

The cost of building the concrete retaining wall was $14,500, of which $13,000 was a part of the proceeds of

the sale of the municipal bonds. The remaining $1500 was drawn from the general funds of the municipality.

The projecting wooden bulkheads and cribbing at both the eastern and western ends of the concrete retaining wall, which have been described as constituting the wooden retaining walls, were constructed after the erection of the concrete retaining wall. The base of the fill was about 1100 feet and its length, when measured along the prolonged line of the concrete wall, was about 1000 feet, or 500 feet more than the length of the concrete retaining wall. The minimum width of the fill back of the concrete wall was 100 feet. At the eastern end of the fill it was within 25 feet of the eastern boundary of the park and 225 feet in width, while at the western end of the fill it was 35 feet from the western boundary of the park and 125 feet in width. These measurements indicate the large frontage of the fill, which was wholly unprotected by the concrete retaining wall from the washing of surface water and the erosion of the tidal waters of the bay. Under these physical conditions, the earth, as it was excavated from the bottom of the basin, could not be held fast within the area contemplated. Notwithstanding the obvious peril and the necessity to construct the adequate devices or works to prevent the spread of the dredged material beyond the confines of the park, adequate precautionary measures were neglected, and dredging operations began on the yacht basin in January, 1937, and the material dredged was placed back of the concrete retaining wall, with the natural and to be anticipated consequence that the material escaped to the west and moved some 600 or 700 feet westerly along the shore in front of the properties of Tydings and of the plaintiff. One of the engineers on the work in the employ of the municipality observed this condition, and informed his superior, J. Spence Howard, who was also employed on this work by the municipality, of what was happening, and that it would likely cause an action for damages against the municipality, but nothing was done at the time to prevent the further

movement of the material. Before it was stopped by the erection in May and June, 1937, of the bulkhead or wooden retaining wall, with an interior reinforcement of earthen dikes, the material at large had made a fill which extended some 700 or 800 feet to the west from the western limits of the yacht basin, with an average depth of two feet. It is estimated that about 6000 or 7000 cubic yards of fill were thus deposited in front of the plaintiff's property. The effect of the deposit is that at mean low tide the earth is seven or eight inches above the water while formerly, at the same state of the tide, there was a depth of a foot and one-half to two feet of water. Before the injuries complained of, the plaintiff was able to reach the deep water of the Chesapeake Bay from his home in his house boat with a draft of twenty-six inches. The deposit has completely destroyed this use. There were two channels which he used in going to and from his shore front. One was some distance out, and the deeper one was close in shore. The latter is filled up and rendered useless. In ducking, the plaintiff could get to the flats for the shooting in his boat, but now this is prevented by the accumulated mud and marsh grass and cat-o-nine-tails.

These and other injuries affect the property of the plaintiff in a manner peculiar to the property in question, and so inflicted upon its owner injuries which were not in common with those sustained by the public generally. For these wrongs an action on the case would lie. *Toy v. Atlantic Gulf & Pacific Co.,* 176 Md. 197, 4 A. 2nd 757.

If the jury believed these facts, the plaintiff was entitled to recover. In the first place, the charter of the municipality made it subject to suit, and enabled it to discharge its pecuniary obligations by the grant of the power to levy taxes for its municipal purposes. The public improvements described were within the authorized public undertakings of the municipality. Code of Public Local Laws (Flack), vol. 2, art. 13, sec. 302. Furthermore, express provisions were made for the improve-

ments undertaken, and the municipality acted pursuant to the grant. *Infra.*

The Acts of 1933 (Special Session), ch. 30, known as "The Public Works Act," as amended by chapter 393 of the Acts of 1935, empowered the municipality of Havre de Grace to construct, and to extend, replace, operate, develop, better or improve, any public works project within the limits of the municipality, and to receive aid therefor in the form of grant, loan or other financial assistance from any federal agency, and to make and perform all such contracts on such terms, provisions and conditions as may be necessary, proper, or advisable for the purpose of obtaining or securing grants, loans, or other financial assistance from any such federal agency. Acts of 1933, ch. 30, sec. 1(a), (e), sec. 2(a), (b), (h), (j), sec. 4, sec. 7.

For the purpose of making improvements to the municipal reservoir, sewerage system, sidewalks, pavements and park, application for a loan was made to federal agencies. These objects are all within the statutory definition of "public works project," *supra.* The plan contemplated the issue by the municipality of $100,000 in bonds in order to obtain the other two-thirds of the expense of the entire project. The resolutions of the municipality for the calling of a special election to approve or disapprove the issue of the bonds stated the proceeds, together with funds to be obtained through federal agencies, were to be used "for the making improvements to the City Park System." The title of Ordinance No. 404, which was enacted on October 21st, 1935, after the referendum had resulted in the approval of the proposed issue of bonds, states the object, *inter alia,* is "for making improvements to the City Park." The ordinance begins with an introductory recital of various precedent steps in relation to the undertakings. It declares that a resolution was adopted on July 15th, 1935, to file an application "for a loan and grant to aid in financing * * * the construction of a yacht basin, and dredging and the improvement of the City Park." It states the

acceptance, on October 21st, 1935, of the offer of the Federal Government "to aid by way of loan and grant in financing channel and yacht basin construction and extension of the City Park with dredging."

After the preamble, the record is that by section four, paragraph two of this ordinance, the proceeds of the bond issue was apportioned, so that:

"2. For the construction of a bulkhead at the City Park and for filling back of said bulkhead by dredging there shall be expended by the Mayor and City Council of Havre de Grace from the proceeds of the sale of bonds hereinabove authorized, the sum of Thirteen Thousand Dollars ($13,000.00) and no more; the total cost of said public works project being approximately Eighteen Thousand Dollars ($18,000.00) and the difference between the amount hereby authorized to be expended by the Mayor and City Council of Havre de Grace on said project and the total cost thereof having been granted to the Mayor and City Council of Havre de Grace by the United States of America through the agency of the Federal Emergency Administration of Public Works.

"As heretofore recited in this ordinance an application was made by The Mayor and City Council of Havre de Grace to the United States of America for a grant of funds, which, together with the sum of Thirteen Thousand Dollars ($13,000.00) to be expended by The Mayor and City Council of Havre de Grace would be sufficient for the construction of said improvement to the City Park and also for the construction of a yacht basin adjacent thereto, the total cost of such project to be Thirty-seven Thousand Dollars ($37,000.00) and the grant therefor from the United States of America to be Twenty-four Thousand Dollars ($24,000.00). Said application for funds has not yet been granted. Wherefore, in the event said funds are granted then in that event The Mayor and City Council of Havre de Grace be and it is hereby authorized to proceed with the construction of said total project as outlined in said application. In the event said funds are not granted then

The Mayor and City Council of Havre de Grace is authorized to proceed only with the construction of the bulkhead at the City Park and the filling behind the same, using for that purpose the sum of Thirteen Thousand Dollars ($13,000.00) hereinabove allocated thereto, together with the sum of Five Thousand Dollars ($5,000.00) of the total grant made by the Federal Emergency Administration of Public Works for the construction of said entire project; provided, however, that in no event shall any costs incurred in connection with the construction of so much of the yacht basin as is located outside of the corporate limits of The Mayor and City Council of Havre de Grace and in the Chesapeake Bay be paid from the proceeds of the sale of the bonds hereinabove authorized, but all of such costs shall be paid from such other moneys as may be received by The Mayor and City Council of Havre de Grace from the United States of America."

The statutes and ordinance establish that the contemplated improvements were a municipal project in the course of which agencies of the Federal Government furnished, in large part, money and labor.

There is no question that the municipality built the concrete retaining wall at a cost of $14,500; and that $13,000 of this was a part of the proceeds of the issue of bonds mentioned. There is, also, no controversy that a civil engineer, J. Spence Howard, was employed in 1936 to represent the municipality in the entire project, and that, in this capacity, he supervised the construction of the concrete retaining wall, and the extension of a wood bulkhead, at either end of the concrete wall, for about 100 feet towards the south and forming an obtuse angle with the face of the concrete wall. In his testimony, the engineer asserted that this was the end of the work under the direct control of the municipality. As thus built the municipality delegated to the federal agency, known as the Works Progress Administration, the work of dredging the material out of the bottom of the proposed yacht basin and pumping it over the re-

taining wall as thus completed, and discharging the dredged material from the pipe lines into the shallow water between the line of the wall and the natural shore line of the park. The dredged effluent, as it flowed upon the area of the then submerged two acres to be reclaimed by this operation, was made more soluble and fluid as it came in contact with the water it was to displace, and so negligence on the part of the municipality may well be inferred, if these are found to be the facts. To stop the dredged material from flowing back into the basin from either side of the retaining wall, and from escaping through the open outlets to the east and west, which were as wide as the distance of the retaining wall built by the municipality from the parallel old shore line of the park, there is testimony to show permanent retaining walls were indispensable and should have been contemplated and erected before the dredging was begun. There is testimony to the effect that the mischief had been done before the extensive openings to the south, east and west, through which the dredged material had escaped, were closed by the present effective and permanent retaining walls.

To avoid the effect of negligence and the burden of liability, the defendant relies upon the contention that it is a governmental agency in making the yacht basin and, by artificial means, in reclaiming two acres of shallow water by filling the area with dredged material. The defendant further argues that there is no liability, as the federal agency made the contract with a third party for the dredging and the reclamation of the two acres of shallow water in front of the park. It is contended that the defendant is not bound by the negligence of the third party, an independent contractor.

The difficulty of this last position is that there is testimony from which it may be found that the situation which existed when the dredging began was created by the defendant, which took no step to guard against its apparent danger, but permitted the dredging to begin and proceed under known conditions of peril to the rights in property of riparian land owners.

180

If the testimony of the president of the contracting company is true, and that is for the jury to find, his company was not bound by its contract even to provide temporary retaining walls so as to prevent the escape of the dredged material. So, clearly, it may be found that the defendant is liable. The defendant owed a duty to prevent the dredged material from escaping from the area over which it was placed. The defendant is, therefore, none the less liable for its own negligence because the direct cause of the damage might have been the negligence of an independent contractor who is engaged in doing work on the park of the defendant for its benefit. There is testimony from which it may be found that no steps were taken to apprise the dredging contractor that it was not to proceed until the necessary additional retaining walls were built, or that the municipality had seen that it was made a part of the contract for the dredging company to build them. It was evidence of negligence, under the circumstances, for the defendant to have the dredged material put in shallow water, where its escape was a probable consequence, without taking adequate precautions to secure its stability. The negligence here is not that of the contractor in the way he did the work in the way he agreed to do, but is a danger which arose from the doing of the work as agreed under conditions for which the defendant is responsible. 1 *Beven on Negligence* (4th Ed.), pp. 533-538. See *Frenkil v. Johnson*, 175 Md. 592, 599, 3 A. 2nd 479; *Hughes v. Duluth*, 204 Minn. 1, 281 N. W. 871.

Nor may the defendant escape liability on the theory that it is a municipal corporation which was engaged in the performance of a governmental function which resulted in the damage complained of in reference to the plaintiff's property. The rule is well established by many decisions, of which *Baltimore v. State, use of Blueford*, 173 Md. 267, 195 A. 571, is a recent one. However, the rule does not apply to the case at bar, where the wrong complained of is the artificial accumulation of an unstable compound of dredged earth and water in a semi-

fluid state upon a strip of land of two acres, which is submerged by about two feet of water, without adequate means of retention, so that the dredged material would probably escape from the park of the municipality and flow and subside upon the water front of adjacent property. When what was thus inherently probable happened, and the property rights of adjacent riparian owners were invaded and destroyed, the municipality is liable in case for the wrong, which was thus negligently inflicted. *Baltimore v. Merryman,* 86 Md. 584, 590-594, 39 A. 98; *Livezey v. Bel Air,* 174 Md. 568, 199 A. 838; *Taylor v. Baltimore,* 130 Md. 133, 99 A. 900; *Hitchins v. Frostburg,* 68 Md. 100, 11 A. 826; *Guest v. Church Hill,* 90 Md. 689, 45 A. 882. See *Baltimore v. Eagers,* 167 Md. 128, 136, 173 A. 56.

The preceding statement of facts is based upon the testimony which tended to support the plaintiff's case. There is testimony in conflict with this narration, which the court is required to make because of the prayers on the part of the defendant which are a demurrer to the legal sufficiency of the evidence to support the plaintiff's action. The jury resolved the controversy on the facts in favor of the plaintiff. With that conclusion this court does not deal. It simply finds that the prayers which are a demurrer to the evidence must be rejected, if the jury should find from the testimony the facts to be as the evidence offered tended to prove. So, the defendant's A, C, D, E, F, G, H and I prayers were properly rejected. The defendant has formally abandoned its B, 8, 16 and 17 prayers. Its 4th, 12, 14 and 14A prayers are mentioned and not argued on brief, are involved in the rulings on the demurrer prayers, and were likewise objectionable. The eight prayers granted on the part of the defendant submitted every phase of its defense to the jury.

The exceptions are not in form to present exceptions to the court's ruling on the special exceptions to the plaintiff's 1A and 2A prayers. The exceptions certified are not to the refusal of the court to sustain the special

exceptions filed, but to the court's ruling on the granting of the plaintiff's 1A prayer and 2A prayer. The two prayers offered by the plaintiff and granted go to the right of recovery and the measure of damages. The damage prayer is based on the necessity of a previous finding for the plaintiffs. It limits the damage recoverable to the difference between the fair market value of the property in question before the injuries complained of and after their commission, "together with such loss as the jury may believe the plaintiffs sustained, if any, in the usable value of the property," less such damages as the plaintiffs might have prevented by reasonable expense and trouble and except all damage which may have been caused to said property in common with that sustained by the general public.

The chief criticism of this prayer is that it includes as an element of compensation the "usable value." The theory is that "usable" value is embraced in the difference in the market values, and that its inclusion works double compensation. If this were true, the prayer would state a false standard of damages. The plaintiffs are entitled to but one compensation. However, they are entitled to complete satisfaction. *Commissioners of Aberdeen v. Bradford*, 94 Md. 670, 683, 51 A. 614; *Birch v. Lake Roland Co.*, 83 Md. 362, 371, 372, 34 A. 1013.

It is obvious from the context that the "usable" value included is not rental value, which would make the prayer bad, and the jury could not have taken that view, as the plaintiffs occupied the premises affected, and so were not deprived of the use or rent. The prayer was intended to be adapted and applied to the testimony given, and "usable" value referred to the personal enjoyment and use by the plaintiffs as occupiers of the premises, independently of the difference in market value. There is no special exception to the prayer on the ground that there was no testimony of this form of damage; and there is proof that the plaintiffs could not house their boat because of the fill complained of, and were thus obliged to pay storage and wharfage charges of about

§50. In *Commissioners of Aberdeen v. Bradford, supra,* the damage prayer submitted as recoverable loss the permanent injury to the land and, as a distinct item, the loss occasioned by reason of the deprivation of the normal supply and use of water for farming and canning purposes. The court quoted with approval the remark of Lord Halsbury in *Darby Main Colliery v. Mitchel,* 11 App. Cases, 127: "That for one cause of action you must recover all damages incident to it by law once and forever." 94 Md. page 683, 51 A. page 616.

The remaining question on the prayers is raised with respect to plaintiffs' 1A prayer, which based the right of recovery upon the jury's finding that the plaintiffs had a water-way in front of their property to the Chesapeake Bay, which provided access to and from their property to the main waters of the bay, and that the defendant caused the said way to be filled with earth or other obstruction to such an extent that the plaintiffs were permanently deprived of the customary use of said water-way by the occupiers of said property and that thereby the value of the plaintiffs' property was depreciated in value. There can be no question that the facts submitted, if found to be true, constitute a good cause of action. *Jones on Easements,* secs. 547, 548. *Garitee v. Baltimore,* 53 Md. 422, 431; *Cahill v. Baltimore,* 93 Md. 233, 237-240, 48 A. 705; *Taylor v. Baltimore,* 130 Md. 133, 146-149, 99 A. 900; *Baltimore v. Merryman,* 86 Md. 584, 39 A. 98. The jury was required to find that the defendant "caused" the water-way to be obstructed and destroyed. If the jury found that the defendant was the cause, the defendant would be responsible for this unlawful obstruction of the water-way, whether the action would be in trespass, where the injury would be a direct invasion of the property, or in case, if an indirect one. There was no special exception on the ground of a variance. The defendant's granted prayers afforded the defendant every opportunity to present its defense to the jury. Its prayers are so ample in defense that the court does not commit itself to their

approval, as their soundness is not raised on this appeal.

After a full consideration, there is not found any ground for reversal in the court's action on the prayers.

The remaining questions are on the court's ruling on the testimony. Thirty-four exceptions were taken.

A few of the exceptions on the testimony are abandoned, but a number remain and may be grouped. The exceptions Nos. 10 to 15, both inclusive, are on the refusal of the court to permit Walter G. Finch to answer certain questions which related to his official connection with the Works Progress Administration; and to what work he was employed to do as its representative. Finch is a civil engineer with a total compensation a month of $200, of which the federal agency paid him $120 and the municipality $80. The questions asked were not important, and all that was relevant and inquired of, became, in the course of the trial, a part of the record. No material injury, therefore, resulted from the court's rulings, although the ground on which he based it is unusual.

The court's reason for the exclusion of these questions is a letter from Harry C. Hopkins, PWA Administrator, to all the State Works Progress administrators. The pertinent quotation:

"Subject: Release of Official Information of Records.

"No officer or employee of the Works Progress Administration shall furnish any information or make available any official document or paper, or copy thereof, to any person, except persons having official business with the Works Progress Administration.

"In all cases where documents or records are subpoenaed, the issuing officer or body shall be informed that such documents can be furnished only upon order of the Federal Administrator and that the request should be addressed to him. A full report outlining the information desired and the circumstances must be immediately forwarded by the Works Progress Administration officer to the Federal Administrator.

"In all cases where a WPA officer or employee is requested to testify in regard to matters of an official or

confidential character, knowledge of which was acquired in his official capacity, he shall respectfully decline to answer. If his reasons are requested by the court or body conducting the hearing, he shall courteously state that the matter is privileged and cannot be disclosed without specific approval from the Federal Administrator.

"It is not the intent of these instructions to withhold information regarding the Works Progress Administration, but to affirm the fact that the disclosing of official documents or records of the Works Progress Administration is a question to be decided only by the Federal Administrator. Harry L. Hopkins, Administrator."

Whatever may be the inter-departmental effect of this edict, it certainly cannot have the effect in a court of law of preventing material and relevant testimony, not inherently privileged on the ground of public policy, being given by a witness, no matter what may be his connection with the federal agency. It is only on the ground of its immateriality and lack of prejudicial error, that the court here finds no ground to reverse on these exceptions.

The rulings on the admissibility of the testimony of Fred C. Lawder, a real estate agent, who had been qualified to testify as an expert, are found in exceptions Nos. 16 to 23, both inclusive. Much of the testimony objected to was given by the witness without exception. In this ruling, the court finds no such injury as to warrant a reversal.

The exceptions 24 to 27 and 34 are to the refusal of the trial court to allow defendant to impeach the testimony of the expert Lawder by offering in evidence the tax records to show the assessment of the land in question in the summer of 1937 by him as an official appraiser. The witness had testified that he had not assessed the property, when unimproved, at its actual value, because it then represented a transfer of a portion of the Tydings land. He was then asked: Is there any difference in making an assessment for taxation purposes

and placing a valuation on this property for the purposes of this case? On the court's refusal to permit the question, the defendant then made ten successive proffers of proof, now combined in one exception, whereby he sought to inquire if the witness had not made certain assessments in 1927; if he had taken into consideration the appraised value of the unimproved property of the plaintiffs in 1936; and how he could explain the differences in his valuation as an expert and his valuation as an assessor, and similar inquiries were proffered. Aside from the technical defects in so combining the offers without taking a separate ruling on each offer, the basis for an impeachment is not shown.

If the proffers had been separately made, they should at least have been accompanied with the identification of the assessments as having been made by the witness in his official capacity and as his independent act, in order for the question of impeachment to have been presented. In the form the questions were presented to the trial court, there is no reversible error in the rulings.

The other exceptions were not well taken and do not require separate treatment.

Finding no sufficient error for reversal, the judgment is affirmed.

*Judgment affirmed, with costs.*