IVY H. SMITH CO., INC. *v.* WARFFEMIUS ET UX.

[No. 65, October Term, 1952.]

368

The cause was argued before DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*George T. Burroughs,* for appellant.

*Hal C. B. Clagett* and *Jerrold V. Powers,* with whom were *Sasscer, Clagett and Powers* and *Lansdale G. Sasscer, Jr.,* on the brief, for appellee.

HAMMOND, J., delivered the opinion of the Court.

This appeal involves the liability for trespass of the Ivy H. Smith Company, Inc., the appellant, a contractor which under written contract undertook to prepare a right of way and erect a high tension line for an electrical cooperative, and, in the course of its work, entered on the land of the appellees, and cleared a swath 100 feet wide by 300 feet long of trees and shrubs.

The Southern Maryland Electric Co-operative, Inc., having determined to construct a high voltage transmission line in Southern Maryland, negotiated with property owners along the proposed right of way and secured easements for the construction and maintenance of the line. On August 30, 1950, it obtained a written authorization, signed, sealed, and acknowledged by the appellees, Theodore Warffemius and Eleanor A. Warffemius, his wife, granting unto the Co-operative, "and to its suc-

cessors or assigns", the right to enter upon their land described in the writing, and to "construct, operate and maintain on the above described lands an electric transmission line of (sic.) system in the pole locations as staked by the Cooperative's Engineer, and to cut and trim trees and shrubbery to the extent necessary to keep them clear of said electric line or system at least 50 feet on each side." The Co-operative agreed to pay fifteen dollars for privileges granted and for crossing woodland located within the described boundaries.

On September 5, 1950, the Co-operative entered into a contract with the appellant, under the terms of which the Smith company, referred to as the "Contractor", was to clear the easement right of way and to build the transmission line. The Contractor agreed to clear and build "in strict accordance with the plans, specifications and construction drawings therefor, attached hereto and made a part hereof".

Another provision of the contract was that:

"The contractor shall not proceed with the cutting of trees or clearing of right-of-way without written notification from the engineer that the proper authorization has been received from the owner of the property, and the contractor shall promptly notify the engineer of whenever any landowner objects to the trimming or felling of any trees or the performance of any work on his land in connection with the project and shall obtain the consent in writing of the engineer before proceeding in any such case".

The Co-operative was obliged to furnish blueprints of the right of way and to stake off the line, locating the stakes in the center so that the line would be cleared 50 feet on each side, making a 100 foot right of way. The stakes were numbered and the corresponding numbers appeared on the blueprints. The staking and preparation of the blueprints was done for the Co-operative by the B. O. Vannort Engineers, Inc., generally referred to in the papers and by the parties as the "Engineer",

which generally had charge of the engineering phases of the work. Before Mr. and Mrs. Warffemius signed the easement, they had caused the proposed line to be moved away from their house and down near the corner of their property. The Engineer surveyed and staked this agreed line and prepared the blue prints accordingly. However, after this had been done, and because one of a number of co-owners of the tract of land adjoining that of the Warffemiuses, either could not be found or would not sign an easement agreement, the Co-operative decided not to wait to obtain this signature, but to prepare a new line. The new line ran to the East of and was entirely off the Warffemius property. The Engineer left in the line of stakes over the Southwest corner of the Warffemius property—the line agreed to and authorized as the easement line.

The new line was not desired by the Co-operative and the change cost thousands of dollars. At any time before the poles were actually in the air, the Co-operative would have reverted by preference to the original line over the Warffemius property and the adjacent properties if the necessary owners' signatures could have been had.

The Contractor began work shortly after the signing of the contract and, using several crews, had cleared from the Hughesville end of the line to the Warffemius property by November 26, 1950. On that day and the next, it cleared a swath 100 feet by 300 feet on the Warffemius property along the easement line. It is conceded that all the cutting was done within the area covered and authorized by the easement agreement. On the first day of the cutting, Mrs. Warffemius asked the foreman of the crew if there was not a mistake, but made no objection to the cutting, nor any effort to stop it. Indeed, she, in substance, repeated that immortal plea "Woodman, spare that tree!", and asked that an oak not be cut. This wish was respected. She called her husband to ask what, if anything, could be done, and was told by him, "Nothing, I think." Mr. Warffemius

had conversations with the foreman of the crew as to the size of the logs which the felled trees were to be cut. The agreement with the Co-operative had provided that the trees were to be cut into logs of specified size and left on the property, and this was done in accordance with that agreement and Mr. Warffemius' wishes.

On the second day of the cutting, the crew, as they put it, ran out of stakes, and was put on notice that something was wrong. This was confirmed at lunch, when the foreman was told by a neighboring landowner that the line had been relocated. It was about this time also that Mr. Warffemius ordered the men to stop cutting. Mr. Whitley, Superintendent of the Smith Company, in charge of the work, and Mr. Taylor, the foreman, then went to Mr. Shull, Resident Engineer of the Vannort Company, and were given new blueprints covering the relocated line. It was the unvarying practice of the Contractor to cut from the stakes, after verifying the numbers with those corresponding on the blueprints. If land was not to be cut over, the blueprints were marked with a red pencil as to the prohibited areas. There was no such warning as to the stakes and stations on the Warffemius property.

In May, 1951, the appellees filed suit against the Smith Company for trespass. On motion of the defendant, the Co-operative was brought in as a third party-defendant, and a complaint filed against it by the Smith Company. At the close of the trial, the court granted the Co-operative's motion for a directed verdict as to it. The court then instructed the jury "as a matter of law that from all the evidence in this case the plaintiffs are entitled to recover a verdict at your hands". The only question left to the jury was that of damages. Its attention was directed to Section 365 of Article 66C of the 1951 Code. This provides that persons "who shall wilfully, negligently, recklessly, wrongfully * * * and without the permission or authority of the owners * * * cut, burn or otherwise injure and destroy * * * any merchantable trees or timber", shall be liable to the

persons injured or aggrieved, in an amount double the value of the trees. On the testimony of Mr. Warffemius that the merchantable trees cut had a value *to him* of fifteen hundred dollars, and the transplantable holly and other decorative shrubs or trees, a value *to him* of another fifteen hundred dollars, the jury returned a verdict of two thousand dollars against the appellant. A motion for judgment *n.o.v.* was denied, and this appeal followed. It was later dismissed by the appellant as to the Cooperative.

The appellant argues that a verdict should have been directed as to it, on its timely motion, and we agree. The controlling rule is that an agent ordinarily will incur no liability for doing an act which the principal might lawfully or properly have done. Various aspects of the Rule are set forth in the *Restatement—Agency,* in the following Sections:

Sec. 343. General Rule.

An agent who does an act otherwise a tort is not relieved from liability by the fact that he acted at the command of the principal or on account of the principal, except where he is exercising a privilege of the principal, or a privilege held by him for the protection of the principal's interests.

Sec. 345. Agent Exercising Privileges of Principal.

An agent is privileged to do what otherwise would constitute a tort if his principal is privileged to have an agent do it and has authorized the agent to do it.

Sec. 347. Applicable Immunities of Principal.

An agent who is acting in pursuance of his authority has such immunities of the principal as are not personal to the principal.

*Herzog v. Mittleman,* 155 Ore. 624, 65 P. 2d 384, 109 A. L. R. 662; *Harding v. Ohio Casualty Insurance Company,* 230 Minn. 327, 41 N. W. 2d 818; *Strong v. Colter,* 13 Minn. 82, Gil. 77.

In the *Herzog* case, cited above, the owner of a car invited a guest to drive the car and an accident occurred. Suit was filed by another guest in the automobile against the driver and the owner. Under the Oregon statute the owner host would not be liable unless guilty of gross negligence. It was held that the driver guest had the privilege or immunity of his principal, and under the statute would be excused from liability for all but gross negligence.

It can be assumed—there is no necessity to decide and we do not—that the Smith Company in the execution of its obligations under the contract with the Co-operative was generally an independent contractor. Under this assumption it and not the Co-operative would be responsible for negligence of omission or commission in the undertaking of clearing the right of way and the erection of the transmission poles. Yet, in the broadest sense, when one accomplishes a given result through the afforts of another, there is an agency. The rules which govern the relations of principal and agent, of employer and employee, and of employer or owner and independent contractor, are often distinct but may be identical so that one statement will suffice for all and illustrations may be drawn from all fields. *Mechem* on *Agency*, 2d Ed., Section 25. In the *Restatement—Agency*, Section 2, agents are divided into servants and independent contractors. "An agent who is not a servant is, therefore, an independent contractor when he contracts to act on account of the principal * * * While an agent who contracts to act and who is not a servant is therefore an independent contractor, not all independent contractors are agents." Generally an independent contractor who is not an agent "must have contracted to do a specific work, and have the right to control the mode and manner of doing it." *Bogatsky v. Swerdlin,* 152 Md. 18, 135 A. 416, 420. In *Hanrahan v. Baltimore City,* 114 Md. 517, 80 A. 312, the City was held to be liable for the negligence of an independent contractor while perform-

ing a sewer contract. The court said, 114 Md. at page 532, 80 A. at page 318:

> "Nor is there any difficulty in holding the City to be liable in this case for any negligence of the contractors in their performance of their contract, resulting in injury to the plaintiff; since the evidence is undisputed that the contractors were under the supervision of the City, and that the division sewer engineer was in control of the work. But even if Talbott & Co. were independent contractors the case would not be different. Judge Schmucker, in *Bonaparte v. Wiseman*, 89 Md. 21, referring to *DeFord v. Keyser*, 30 Md. 179, declared 'the distinction to be well established between the cases in which, when work is being done under a contract, an injury is caused by negligence in a matter collateral to the contract, and those in which the thing contracted to be done causes the mischief. In the former class of cases the employer is not liable for the injury, but in the latter he is.'"

In *Havre de Grace v. Maxa*, 177 Md. 168, 9 A. 2d 235, the suit was against the municipality for construction of a yacht basin in such a way as to damage the plaintiff's property. The defense was that the work was done by an independent contractor. The court, in holding that a judgment against the City was proper, said, 177 Md. at page 180, 9 A. 2d at page 241: "The negligence here is not that of the contractor in the way he did the work in the way he agreed to do, but is a danger which arose from the doing of the work as agreed under conditions for which the defendant is responsible."

The Co-operative assumed and exercised the control of the mode and manner in which rights of way were acquired, it caused to be surveyed and staked the centre line of the right of way and it had prepared the blueprints. It said when to proceed and when to desist.

We think that in this aspect of the project the Smith Company was the agent of the Co-operative and entitled to the privileges and immunities of the Co-operative.

The argument of the appellees is that though this be so the Smith Company was not authorized to do as it did on their property. They rely on the terms of the written contract that the contractor shall not proceed to cut trees or clear right of way "without written notification from the Engineer that the proper authorization has been received from the owner of the property" and the further requirement that the contractor shall obtain written consent before proceeding "whenever any landowner objects to the trimming or felling of any trees or the performance of any work on his land in connection with the project". These restrictions on independent action by the Smith Company themselves cast significant light on the relationship which the parties envisioned they held as between themselves. Clearly they were intended to prevent a trespass by the contractor and thus liability on the Co-operative—and it would not be liable unless the contractor were its agent. The evidence in the case shows that the contractor was given blueprints of the line to be cut, showing the stake numbers. The blueprints did not reveal individual property lines. The practice was for the blueprints to be marked in red to indicate particular properties as to which easements had not been secured. The Smith Company had been working for some two months by the time it reached the appellees' place. They found and worked the line they were to clear always by matching the stakes in the ground with the blueprints bearing the station numbers which corresponded with those on the stakes. They worked the Warffemius property in this same manner. The stakes found there corresponded in number and station with the numbers and stations on the blueprints furnished and there were no warning red pencil marks. The Co-operative by its manager and by the resident

engineer of the Engineer named in the contract gave testimony that the Smith Company was never directed to go on the Warffemius property and it produced a copy of a letter dated September 15, 1950, addressed to "Ivy H. Smith, Contractor, Waldorf, Maryland", and signed for the Engineer by its resident engineer in the job,—the same one who testified and who was in daily contact with the Superintendent of the Smith Company. It read: "The following right-of-way easements have not been secured * * * You are hereby instructed not to proceed with any type of construction on these properties until further notice." The Warffemius property was included in those listed by station numbers. The testimony of the Superintendent of the Smith Company was that the letter was never received. There was no testimony that it was ever delivered or mailed but the appellant did not object to its introduction in evidence. In any event, it was inaccurate as to the Warffemius property because an easement had been secured and was outstanding as to it. The contract limitation was to avoid the working of lands as to which there were no easements. There was no repudiation or attempt to repudiate the evidence that the method of work invariably was to follow the pattern of stake and blueprint, with number matching number and with warning red as to prohibited territory on the blueprint. There can be no real or reasonable doubt that the Smith Company had been authorized to proceed at least to the far end of the Warffemius property and that it worked there as it had worked all along the line. The parties invariably and deliberately refer to the letter of September 15 as a "stop order" which of itself presupposes a start order and the resident engineer of the Engineer who signed the stop order and who testified for the Co-operative, when asked what instructions he gave the Smith Company superintendent as to cutting on the relocated line, said "I gave him no instructions because he had already been cutting right-of-way. I just showed him the location he was

to cut on." There was no thought that any writing was expected, required, or given.

Whether the numbers on the stakes, and the writings and numbers on the blueprints, where there was no warning red, amount to "written notification from the Engineer that proper authorization has been received from the owner", as well might be, and whether the parties so interpreted it—Section 42 of the *Restatement —Agency*—or whether this procedure was a deviation from the formally intended course of action which was acquiesced in by Co-operative—Section 43 of the *Restatement—Agency*—is immaterial, for the result is the same. We think under the parties own interpretation of the contract the appellant was authorized to act as it did in instances, of which the Warffemius property is an example, where there was an existing easement, so indicated on the ground by stakes and so indicated on the blueprints. The stop order letter was not proven to have been delivered or mailed and its receipt was explicitly denied, as was that of any notice whatever not to proceed on the Warffemius place. If the introduction of the letter into evidence without objection be taken as the substitute for proof of mailing, the letter was inaccurate in its characterization of the Warffemius property as one on which no easement had been secured. The Superintendent of the Smith Company says he had been told that the easement had been obtained. The contract terms required a writing so that property as to which no easement had been obtained would not be entered. In the light of this, and of the established course of procedure, we think that it was incumbent on the Co-operative to give the contractor clear and accurate directions not to proceed on property where its previous authority to proceed is shown by stakes on the ground, confirmed by blueprints. This could have been done by marking the blueprints in red or better still by removing the stakes from the property not to be touched.

The reason the stakes were not removed is evidence that the contractor was an authorized agent. The Co-

operative gave frank and explicit testimony, challenged by no one, that if the right of way on the place adjoining that of the Warffemiuses could have been obtained at any time before the poles were in the air, the transmission line would have gone across the Warffemius right of way. If this had happened, it would clearly have been—assuming the original entry and cutting by the contractor had been unauthorized—a ratification by the Co-operative which would have eliminated any potential liability of the contractor to the grantor of the easement. *Restatement—Agency*, Section 360. Whether this tentative acceptance of a benefit, this putting to one side for possible future use of an asset, would add up to ratification, had the original entry been unauthorized, we need not decide. We think that the entry was irregular only in point of time in that it could have been delayed, because the Co-operative was not then sure that it would eventually use it, but that its admitted decision, that it hoped to use the way, and would if possible, waived the irregularity. As *Mechem*, in the work cited, put it in Section 356:

"An act wholly or essentially unauthorized requires ratification; but there may be irregularities in the performance of an authorized act so insignificant that they may be ignored; and there seem also to be cases in which, in the exercise of an admitted authority, there may be irregularities, deficiencies or excesses, not so insignificant that they may be ignored, nor yet so material as to really require ratification of the act as an unauthorized one, but as to which there may be such acquiescence, condonation or disregard as to entitle one to say that they have been waived."

What we have said is in effect that if the appellees had not granted the easement to the Co-operative and the appellant had entered as it did, the Co-operative would have been liable for trespass. *Horrabin v. City of Des Moines*, 198 Iowa 549, 199 N. W. 988, 38 A. L. R.

554.  In the converse here presented the Co-operative as the holder of the easement would not have been liable if it had itself entered. the *South Baltimore Company v. Muhlbach,* 69 Md. 395, at 406, 16 A. 117, 1 L. R. A. 507. The appellant, its agent, is covered with the same mantle of immunity as the principal.

The appellees cannot justly complain of this holding. They agreed after deliberation to permit the clearing of the right of way and the building and maintenance of the transmission towers or poles and the clearing of the right of way from time to time, year after year, forever.  They were to get the lumber cut into logs. Now they have the lumber cut into logs, they are relieved of the future entries which would have been necessary to maintain the transmission line and the right of way, and they do not have unaesthetic towers or poles on their place, the easement now having been abandoned. They attempt to add to these advantages a claim for substantial damages on the ground that their written consent to what happened did not run to the appellant. If the Co-operative, without aid of an agent had entered and acted when, and just as, the appellant did, the appellees would have no right of action, whether or not the electric line was ever built over the property, because the Co-operative would then have been acting under a valid and subsisting easement, not yet abandoned. The appellees, members of the Co-operative, already enjoyed its electric service; the proposed new line carried only very high voltage, was not to provide local service, and would not have benefited them.  If the Co-operative, taking the position it did at the trial that the entry and cutting by the appellant, when and as it occurred, was unauthorized, had merely said "we ratify" (it may, and we hope will, be of use and advantage to us) the appellees would have no right of action, and this, too, whether or not the line was ever built.  It would mock reality to say that the appellees have been damaged here, because the owners of the place next to them would not

sign an easement agreement, when they would not have beend damaged if they had.

*Judgment reversed with costs.*